JEFFREY T. MAKOFF (SBN 120004)
HEATHER A. LANDIS (SBN 267615)
MARIO R. NICHOLAS (SBN 273122)
VALLE MAKOFF LLP
2 Embarcadero Center, Suite 2370
San Francisco, California 94111
Telephone:     (415) 986-8001
Facsimile:     (415) 986-8003
Email:         jmakoff@vallemakoff.com
               hlandis@vallemakoff.com
               mnicholas@vallemakoff.com

Attorneys for Plaintiff
Joe Quirk

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOE QUIRK, an individual,<br><br>                Plaintiff,<br><br>        vs.<br><br>SONY PICTURES ENTERTAINMENT INC., a Delaware corporation; COLUMBIA PICTURES INDUSTRIES, INC., a Delaware corporation; PARIAH, a California corporation; DAVID KOEPP, an individual; DGK, INC., a New York corporation; and JOHN KAMPS, an individual<br><br>              Defendants. | Case No. C 11-03773 RS<br><br>FIFTH AMENDED COMPLAINT FOR:<br><br>(1) COPYRIGHT INFRINGEMENT;<br><br>(2) CONTRIBUTORY COPYRIGHT INFRINGEMENT;<br><br>(3) VICARIOUS COPYRIGHT INFRINGEMENT;<br><br>(4) BREACH OF IMPLIED CONTRACT; and<br><br>(5) DECLARATORY RELIEF<br><br><u>DEMAND FOR JURY TRIAL</u> |

1    Plaintiff Joe Quirk, an individual, for his Complaint, alleges on knowledge with

2    respect to his own acts and on information and belief with respect to all other matters as

3    follows:

4                              **JURISDICTION AND VENUE**

5    1.    This is a civil action arising under the Copyright Act of 1976, 17 U.S.C. §§

6    101 et seq. (the "Copyright Act").

7    2.    This Court has subject matter jurisdiction of this action under 17 U.S.C. §§

8    101 et seq., 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (copyright), and

9    has supplemental jurisdiction over the claims that arise under state law under 28 U.S.C. §

10   1367(a) in that these claims are so related to the federal claims that they form part of the

11   same case or controversy.

12   3.    Venue is proper in the Northern District of California under 28 U.S.C. §§

13   1391(b) and 1400(a), because the defendants and/or their agents reside or may be found in

14   this District, defendants' activities in this District are continuous and systematic and

15   because the claims alleged herein arise, in whole or in substantial part, from defendants'

16   acts and transactions in this District.

17                            **INTRADISTRICT ASSIGNMENT**

18   4.    Under the Civil Local Rules, this action shall be assigned on a district-wide

19   basis.  N.D. Cal. Civ. R. 3-2(c) ("Intellectual Property Actions . . . shall be assigned on a

20   district-wide basis").

21                                   **PARTIES**

22   5.    Plaintiff Joe Quirk ("Quirk" or "plaintiff") is an individual who resides in

23   Oakland, California.  Quirk is the author of the nationally-distributed novel, THE

24   ULTIMATE RUSH (the "Novel" or "THE ULTIMATE RUSH").  Quirk is the owner of all

25   right, title and interest in and to the Novel.  The United States Copyright Office has issued

26   Quirk a certificate of copyright registration (Reg. No. TX0004708649/1998-06-17) for the

27   Novel.

28

1       6.     Defendant Sony Pictures Entertainment Inc. ("Sony") is a Delaware

2   corporation with its principal place of business in Culver City, California.  Sony is

3   comprised of various studios and entertainment brands, including defendant Columbia

4   Pictures Industries, Inc.  Sony is engaged in, among other things, the production, acquisition

5   and distribution of motion pictures and related products.  Sony has engaged in such

6   activities for the motion picture PREMIUM RUSH (the "Film" or "PREMIUM RUSH"),

7   and has announced that it will continue to do so.  The Film is based upon a screenplay titled

8   "PREMIUM RUSH" (the "Screenplay" or "PREMIUM RUSH"), which purportedly was

9   co-written by defendants David Koepp and John Kamps.  The Screenplay and Film infringe

10   Quirk's copyright in the Novel, as set forth herein in more detail.  Sony and/or its agents

11   reside or may be found in this District, and Sony's activities in this District are continuous

12   and systematic.

13       7.     Defendant Columbia Pictures Industries, Inc. ("Columbia") is a Delaware

14   corporation with its principal place of business in Culver City, California.  Columbia is a

15   subsidiary of Sony.  Columbia is among the entertainment companies that produced and/or

16   will promote and distribute PREMIUM RUSH.  Columbia and/or its agents reside or may

17   be found in this District, and Columbia's activities in this District are continuous and

18   systematic.

19       8.     Defendant Pariah ("Pariah") is a California corporation with its principal

20   place of business in Beverly Hills, California.  Pariah produced PREMIUM RUSH and/or is

21   involved in the promotion and distribution of PREMIUM RUSH.  Pariah and/or its agents

22   reside or may be found in this District, and Pariah's activities in this District are continuous

23   and systematic.

24       9.     Defendant David Koepp ("Koepp") is an individual who resides in Los

25   Angeles, California and/or New York, New York.  Koepp is the director of the Film and a

26   purported "co-writer" of the Screenplay.  On information and belief, defendant Koepp has

27   an agent in California and regularly, continuously and systematically conducts business in

28   California (including extensive California business connected specifically with the matters

2

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

1   alleged in this action).  Defendant Koepp is a professional film director and writer who for

2   the past 20 years has specialized in adapting the original works of other writers into feature

3   films.  His past projects, essentially all of which are adaptations, include the following:

4   "Toy Soldiers," "Jurassic Park," "Carlito's Way," "The Shadow," "Mission Impossible,"

5   "The Lost World: Jurassic Park," "Stir of Echoes," "Spider Man," "Secret Window,"

6   "Zathura: A Space Adventure," "War of the Worlds," "Angels and Demons," "The Taking

7   of Pelham 123," "The Little Engine That Could," "Spy v. Spy," and the not yet released

8   "Billionaire's Vinegar" and "Article II."  Defendant Koepp is the alter ego of defendant

9   DGK, Inc.

10          10.    Defendant DGK, Inc. ("DGK") purports to be a New York corporation.

11   Plaintiff is informed and believes that DGK's shareholders include individual defendant

12   David Koepp.  Plaintiff will amend this Complaint when the identities of other

13   shareholders, if any, of DGK are known.

14          11.    DGK is a shell, instrumentality or agent of individual defendant David

15   Koepp.  DGK was formed on or around October 2, 2001 to insulate Koepp from personal

16   liability.  DGK's policies and practices are managed, dominated and controlled by Koepp,

17   such that, DGK has at no time had a separate mind.

18          12.    Defendant John Kamps ("Kamps") is an individual who resides in or near

19   Los Angeles, California.  Kamps is a purported "co-writer" of the Screenplay.  On

20   information and belief, defendant Kamps has an agent in California and regularly,

21   continuously and systematically travels to and conducts business in California (including

22   extensive California business connected specifically with the matters alleged in this action).

23   Defendant Kamps is a professional screenwriter who specializes in adapting the original

24   works of other writers into feature film products, including "Zathura: A Space Adventure"

25   (co-written with Koepp), "The Borrowers," "Mighty Morphin Power Rangers: The Movie,"

26   "The Little Engine That Could" (co-written with Koepp), "Spy v. Spy" (Koepp overseeing

27   script written by Kamps), and "Billionaire's Vinegar" (co-written with Koepp).

28

3

13. Due to their knowledge, relationships, and joint and concerted conduct, each defendant is jointly and severally liable for the acts and omissions of the other defendants herein. In addition to their own actions, DGK, Inc. is also liable for its shareholders' actions to the extent the shareholders acted on DGK's behalf as shareholders or agents of the DGK, in the course and scope of the shareholders' positions at DGK, or to the extent the shareholders benefitted DGK and/or their actions were approved, accepted or ratified by the DGK.

14. The defendants named in Paragraphs 6 through 12 are collectively referred to herein as the "defendants."

## STATEMENT OF FACTS

15. In August 2012, defendants Sony, Columbia and Pariah plan to release a feature-length motion picture, PREMIUM RUSH, starring popular actor Joseph Gordon-Levitt. In March 1998, plaintiff Joe Quirk's first novel, THE ULTIMATE RUSH, was published. The motion picture PREMIUM RUSH is undeniably, substantially and willfully copied from THE ULTIMATE RUSH. Defendants did not obtain Quirk's permission to copy THE ULTIMATE RUSH, or create an adaptation or other derivative work based upon THE ULTIMATE RUSH. Defendants do not intend to compensate Quirk or give him credit for copying and exploiting THE ULTIMATE RUSH in PREMIUM RUSH, in violation of copyright law.

16. Defendants Columbia and Sony, and persons closely affiliated with the other defendants, also received pre-release copies of THE ULTIMATE RUSH Novel and synopses from Quirk's agent under circumstances in which the defendants' use of such materials created an obligation on the recipients' part to compensate Quirk for their use or exploitation. The defendants also obtained originals or copies of authorized, use-restricted screenplays that were was based upon THE ULTIMATE RUSH and used those screenplays in writing the PREMIUM RUSH screenplay – to the point that numerous scenes, and the major chase scenes, in the PREMIUM RUSH screenplay track the action in THE ULTIMATE RUSH screenplays move-by-move in virtually identical sequences.

17.     By this Complaint, Quirk seeks, inter alia, to recover all profits that the defendants have made, and ever will make, on the use of his work, to recover reasonable compensation and other remedies for the use of THE ULTIMATE RUSH, and the only authorized screenplays of the ULTIMATE RUSH, to create and commercialize PREMIUM RUSH, and to enjoin the unlawful exploitation.

**"The Ultimate Rush" Novel By Joe Quirk.**

18.     Plaintiff Joe Quirk researched and wrote his original novel, THE ULTIMATE RUSH, from 1994-1997.  Quirk supported himself by working as a nanny in the San Francisco Bay Area.  In March 1998, THE ULTIMATE RUSH was published by Rob Weisback Books, an imprint of William Morrow, and was nationally publicized in the U.S. and sold overseas.  In October 1999, THE ULTIMATE RUSH was published by St. Martins Press and displayed in general and specialty retail stores throughout the U.S.  THE ULTIMATE RUSH was extensively reviewed and commented upon in the media, and it has been widely commercially available and readily accessible ever since.  THE ULTIMATE RUSH is an action-driven novel, written by Quirk with the intent that it would be made into a movie due to its highly-cinematic features.  California Artists Agency ("CAA"), one of Hollywood's premiere entertainment agencies, represented Quirk and THE ULTIMATE RUSH, and widely distributed the pre-release copies of the Novel and synopses of the Novel among entertainment industry participants, including defendants and persons who were regularly and directly affiliated with defendants and involved in feature film development and production.

19.     In late-2010, Quirk began to receive unsolicited contacts and comments from his publisher, friends and acquaintances, observing that a movie called PREMIUM RUSH was being made, and that PREMIUM RUSH appeared to be the film of THE ULTIMATE RUSH.  Quirk had been unaware that THE ULTIMATE RUSH was being made into a movie.

20.     Through the defendants' public announcements, Quirk learned that a feature-length motion picture titled PREMIUM RUSH, purportedly "co-written" by defendants

1   Koepp and Kamps and produced by Sony/Columbia and Pariah, was scheduled to be

2   released in January 2012.  After the original complaint was filed in this action, defendants

3   rescheduled the Film's release to August 2012 for unspecified reasons.  Plaintiff is informed

4   and believes that the PREMIUM RUSH project was set up (i.e., the screenplay was written,

5   funding was in place and a producer had been selected) around the 2008/2009 time-frame.

6   At the date of the original Complaint, Quirk and his counsel did not have access to the final

7   screenplay of PREMIUM RUSH.  In or about January 2012, defendants provided plaintiff's

8   counsel with a copy of what was represented to be a more final version of the script (the

9   "PREMIUM RUSH-FINAL"), which appears substantially to track the dialogue and action

10   in the actual Film.  Only the Film itself captures the complete dialogue, action and imagery

11   of PREMIUM RUSH.

12          21.     A comparison among THE ULTIMATE RUSH Novel, the draft PREMIUM

13   RUSH screenplay obtained by Quirk before this action was filed ("PREMIUM RUSH-

14   DRAFT"), the only authorized screenplays of THE ULTIMATE RUSH, and PREMIUM

15   RUSH-FINAL, shows that PREMIUM RUSH is plagiarized in substantial part from

16   Quirk's novel, THE ULTIMATE RUSH, and from the authorized screenplays of THE

17   ULTIMATE RUSH.

18   **Plaintiff's Submission Of "The Ultimate Rush" To Defendants, And Defendants'**

19   **Access To "The Ultimate Rush" By Virtue Of Its Broad Public Distribution.**

20          22.     It is impossible before discovery for plaintiff to know exactly how each of the

21   defendants obtained the specific copies of THE ULTIMATE RUSH that were used by each

22   of them.  That defendants did have access to THE ULTIMATE RUSH is shown by, among

23   other things, the many striking similarities among THE ULTIMATE RUSH, PREMIUM

24   RUSH-DRAFT and PREMIUM RUSH-FINAL, generally and in its specific elements, the

25   direct submission of plaintiff's works to defendants and the submission of the works to

26   persons connected with the defendants during relevant times.  Access is further

27   demonstrated through the similarities among the authorized screenplays of THE

28   ULTIMATE RUSH drafted by Jason Hefter in which he revised an earlier authorized draft

1  screenplay written by screenwriter, Matt Healy (which incorporated substantial elements of

2  the Novel), the earlier Healy draft, and PREMIUM RUSH-DRAFT and PREMIUM RUSH-

3  FINAL.

4         23.    **Direct Submission to Columbia/Sony.**  Plaintiff crafted THE ULTIMATE

5  RUSH as a potential feature film.  Plaintiff's CAA agent, Matthew Snyder, identified

6  defendant Columbia (a subsidiary of defendant Sony) as a possible strong candidate for the

7  project.  Accordingly, Mr. Snyder personally and directly contacted Columbia and pitched

8  THE ULTIMATE RUSH as a possible feature film project on three separate occasions.

9  First, Mr. Snyder personally contacted and spoke with a representative of Columbia to

10  discuss THE ULTIMATE RUSH.  Mr. Snyder followed-up this discussion with a personal

11  letter and submitted a pre-release copy of the Novel directly to Columbia on August 4,

12  1997.  On April 1, 1998, after THE ULTIMATE RUSH was published, Mr. Snyder sent

13  Columbia another letter and directly submitted a final copy of the Novel, along with press

14  clippings.

15         24.    The most direct recipient of each contact between plaintiff's agent and

16  Columbia/Sony was Michael Costigan.  Costigan worked directly with Koepp on the movie

17  "The Taking of Pelham 123," which was released by Columbia in 2009 (and obviously in

18  production for the years prior).  By virtue of the personal and direct submission of THE

19  ULTIMATE RUSH to Columbia and Mr. Costigan, and Mr. Costigan's direct relationship

20  with Koepp and Columbia, defendants had a direct avenue of access to the Novel prior to

21  and around the time-frame in which the PREMIUM RUSH project was set up.  According

22  to a "Variety" article, the PREMIUM RUSH project was set up by November 11, 2009 –

23  Koepp and Kamps had a screenplay, Pariah was retained to produce the Film, it was

24  announced that the Film would be a big budget action film and it was being fast-tracked.

25         25.    On August 5, 1997, plaintiff's agent also directly submitted a pre-release

26  synopsis of THE ULTIMATE RUSH for sale and commercialization directly to Sam

27  Dickerman at Radiant Productions.  In around 2005, Mr. Dickerman joined Columbia as the

28  Senior Vice President of Production.  In around March, 2011, Mr. Dickerman was

1   promoted to Executive Vice President of Production at Columbia.  By virtue of Mr.

2   Dickerman's positions within the Production Department at Columbia, defendants had a

3   direct avenue of access to THE ULTIMATE RUSH submission prior to and during the

4   time-frame in which PREMIUM RUSH was set-up.  While it is impossible to know before

5   discovery whether the submission of THE ULTIMATE RUSH to Mr. Dickerman played a

6   role in PREMIUM RUSH, it represents a second direct avenue of access to THE

7   ULTIMATE RUSH project by defendants Columbia and Sony.

8          26.     Beyond the direct submission of THE ULTIMATE RUSH to defendants

9   Columbia and Sony, and the related relationships with Messrs. Costigan and Dickerman,

10  plaintiff also submitted THE ULTIMATE RUSH for sale and commercialization as a

11  feature film to a variety of other parties who are regularly and professionally connected with

12  defendants.

13         27.     **The Levine-Koepp-Polone-Columbia/Sony Relationship.**  Plaintiff's agent

14  also submitted an advance copy of THE ULTIMATE RUSH for sale and commercialization

15  as a possible feature film to Jeff Levine at Castle Rock.  In 1997, plaintiff's agent personally

16  contacted and spoke with Mr. Levine about THE ULTIMATE RUSH.  Plaintiff's agent

17  followed-up that discussion with a personal letter and submitted a pre-release copy of the

18  Novel directly to Mr. Levine and Castle Rock on August 4, 1997.  Castle Rock has a long-

19  standing relationship with Sony and Columbia.  At the time, Mr. Levine and Koepp were

20  working together on the 1998 film "Snake Eyes" (Mr. Levine was the associate producer

21  and Koepp wrote the screenplay).  During the same time period, Mr. Levine also worked

22  directly with Gavin Polone ("Polone"), the owner of defendant Pariah, on defendants

23  Sony's and Columbia's 1999 film, "8mm" (Mr. Levine and Polone were both producers of

24  the film).  While it is impossible to know before discovery whether the submission of THE

25  ULTIMATE RUSH to Mr. Levine played a role in PREMIUM RUSH, these inter-

26  relationships represent a third direct avenue of access to THE ULTIMATE RUSH project

27  by defendants Koepp, Pariah's owner, Polone, Columbia and Sony.

28

8

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

28.     **The Zanuck-Polone-Columbia/Sony Relationship.**  On August 5, 1997, plaintiff's agent submitted a pre-release copy of THE ULTIMATE RUSH for sale and commercialization as a possible feature film directly to Lili Zanuck of The Zanuck Company.  Ms. Zanuck and The Zanuck Company have a long-standing relationship with Sony and Columbia.  Polone worked closely with Ms. Zanuck on NBC's 2005 TV miniseries, "Revelations" (Polone was the producer and Ms. Zanuck was the director).  By virtue of the relationship between Ms. Zanuck, The Zanuck Company, Sony, Columbia and Pariah's owner, Polone, defendants had a direct avenue of access to THE ULTIMATE RUSH project when PREMIUM RUSH was set-up.

29.     **The Imagine-Koepp-Kamps-Columbia/Sony Relationship.**  On August 5, 1997, plaintiff's agent submitted a pre-release synopsis of THE ULTIMATE RUSH for sale and commercialization as a possible feature film directly to Imagine Entertainment.  Imagine Entertainment, and defendants Koepp, Kamps, Columbia and Sony have worked together recently on a variety of films, including "Angels and Demons" (2009) (Koepp screenplay) and "Spy vs. Spy" (2011) (Imagine Entertainment and Koepp are co-producers, Kamps wrote the screenplay).  By virtue of the relationship between Imagine Entertainment, Columbia, Sony, Koepp and Kamps, defendants had a direct avenue of access to THE ULTIMATE RUSH just prior to and around the time-frame in which the PREMIUM RUSH project was set up.

30.     **The Kennedy Marshall-Koepp Relationship.**  On August 5, 1997, plaintiff's agent submitted a pre-release synopsis of THE ULTIMATE RUSH directly to The Kennedy Marshall Company for sale and commercialization as a possible feature film.  The Kennedy Marshall Company and its founders, Kathleen Kennedy and Frank Marshall, produced "Indiana Jones and the Kingdom of the Crystal Skull" (2008).  Koepp wrote the screenplay for the film.  Ms. Kennedy also worked directly with Koepp on "Jurassic Park" (1993), in which Koepp was the screenwriter.  By virtue of the relationship between The Kennedy Marshall Company, Ms. Kennedy, Mr. Marshall and Koepp, defendants had a

1   direct avenue of access to THE ULTIMATE RUSH just prior to the time-frame in which

2   the PREMIUM RUSH project was set up.

3         31.    **The Stovitz-Koepp Relationship.**  On August 5, 1997, plaintiff's agent

4   submitted a pre-release synopsis of THE ULTIMATE RUSH directly to Ken Stovitz for

5   sale and commercialization as a possible feature film.  Plaintiff is informed and believes that

6   Mr. Stovitz is the executive producer of "Billionaire's Vinegar" (Koepp is the director),

7   currently in development.  Mr. Stovitz is also a partner in Overbrook Entertainment, the

8   production company for the film.  By virtue of the relationship between Mr. Stovitz,

9   Overbrook Entertainment and Koepp, defendants had a direct avenue of access to THE

10  ULTIMATE RUSH around the time-frame in which PREMIUM RUSH was set up.

11        32.    **The Koepp-CAA Relationship.**  Quirk is informed and believes that

12  defendant Koepp also is represented by CAA.  Plaintiff does not know the name of Koepp's

13  individual CAA agent, nor the amount of contact between the CAA agents because such

14  information is in the others' exclusive possession.  However, during the period in which

15  CAA submitted THE ULTIMATE RUSH Novel and synopses to Hollywood buyers, over

16  35 CAA agents received submissions of the works, including former and present partners

17  and executives.  By virtue of the relationship between Koepp and CAA, defendants had a

18  direct avenue of access to THE ULTIMATE RUSH before and during the time-frame in

19  which PREMIUM RUSH was set up.

20        33.    In addition to the foregoing individuals, production companies and other

21  entertainment industry participants who have publicly-identifiable relationships with the

22  defendants, a non-exclusive list of other entities and individuals to whom THE ULTIMATE

23  RUSH was submitted is attached hereto as Exhibit A and incorporated herein by reference.

24        34.    With respect to the Novel (but not the authorized screenplays, which were

25  use-restricted and available only through trade channels), the defendants also had access to

26  THE ULTIMATE RUSH by virtue of its broad distribution and ready-availability, in print

27  and online.

28

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

35.     Once having received THE ULTIMATE RUSH, the defendants knew each other well enough to share it and jointly consider a feature film project that exploited the work.  The defendants have worked together on feature film projects for over 20 years.  The projects that Koepp and Kamps worked on together include but are not limited to the following: "The Superconducting Supercollider of Sparkle Creek" (2002), "Zathura: A Space Adventure" (2005), "Ghost Town" (2008), "Premium Rush" (2012), "Spy v. Spy" (2011) and "Billionaire's Vinegar" (not yet released).  Other projects that defendants, or some combination of them, have closely and directly worked on together include but are not limited to: "Stir of Echoes" (1999), "Panic Room" (2002), "Spider Man" (2002), "Secret Window" (2004), "Ghost Town" (2008), "Angels and Demons" (2009), "Billionaire's Vinegar" (not yet released) and "Article II" (not yet released).  These projects straddle all relevant periods of the submission and exploitation of THE ULTIMATE RUSH and its authorized screenplays.

**Defendants' Access To "The Ultimate Rush" And Its Adapted Elements Via The Hefter and Healy Screenplays.**

36.     Defendants also had access to numerous elements of THE ULTIMATE RUSH through authorized screenplays created in 2000 and 2001, entitled, "The Ultimate Rush" and which was expressly based on THE ULTIMATE RUSH novel (the "Healy Screenplay" and the "Hefter Screenplay").  The Healy and Hefter Screenplays were authorized screenplays commissioned by Warner Bros. in 2000-2001 after it optioned the Novel in the late 1990s.  Unlike the Novel, the Healy and Hefter Screenplays were available only through Hollywood channels, were created solely to become a commercial feature film, and were disseminated with the expectation that if it were used in furtherance of a commercial film project, compensation would be paid for such use.  The authority under which the Healy and Hefter Screenplays were written expired in June 2002, at which point all rights in the Novel, including all elements of the Novel that were incorporated or adapted into the Healy and Hefter Screenplays and the rights, e.g., to create a further or different adaptation or derivative work based on the Novel (directly or as the Novel was

incorporated and adapted into the Healy and Hefter Screenplays), reverted to Quirk and have not been transferred since then.  Since the option with Warner Bros. expired, plaintiff effectively controls the right to sell or use the Healy and Hefter Screenplays because Quirk's consent is required by anyone who wants to use the Healy and/or Hefter Screenplays, which incorporated, and were adapted from and derivative of, the Novel, and which were created under a contract between plaintiff and a buyer.  Any producer, writer or other person who wanted to buy, use or exploit the Healy and/or Hefter Screenplays after June 2002 was required to make a compensation deal with plaintiff.

37.     The Healy and Hefter Screenplays were in the defendants' possession when PREMIUM RUSH-DRAFT (which was an earlier iteration of PREMIUM RUSH-FINAL) was written.  The truly bizarre similarities between the opening scenes, the chase scenes and many other scenes, defy any other explanation, and those similarities alone are sufficient to raise a strong inference of access and use.  These similarities are described in Paragraphs 122-139, below.  Other striking similarities between the elements of THE ULTIMATE RUSH Novel, which are adapted cinematically in the Healy and Hefter Screenplays, and PREMIUM RUSH make it wholly improbable that PREMIUM RUSH is anything but a copy of THE ULTIMATE RUSH – which was created with the Novel and the Healy and Hefter Screenplays close to the writers.  Due to overlap between the Healy and Hefter Screenplays, it is often difficult to determine whether a particular copied segment was taken from the Healy Screenplay, the Hefter Screenplay, both or some combination of the authorized screenplays and the Novel.

38.     While plaintiff is not required to establish (and before discovery likely cannot establish) the precise avenue by which the defendants obtained the Hefter Screenplay, entertainment agent Matt Leipzig submitted the Hefter Screenplay directly to at least the following non-exclusive list of Hollywood entertainment industry participants:  Jeremy Klein at The Donners' Company on July 24, 2001; Bruce Hendricks on July 27, 2001; David Hoberman at Hyde Park Entertainment on July 30, 2001; Denise Carlson at the Disney Channel, on July 31, 2001; Karen Glass at Walt Disney Studios on July 31, 2001;

1 | Jennifer Moyer at Alphaville Productions, on August 2, 2001; Jason Weiss at New Regency

2 | Productions, on August 29, 2001; Justin Rosenblatt at Original Film on September 13,

3 | 2001; Tripp Vinson at The Firm on September 25, 2001; Cristi Limm on October 1, 2001;

4 | Stephanie Alain at 3 Arts Entertainment on October 16, 2001; Todd Lieberman at Hyde

5 | Park Entertainment on November 7, 2011; Steven Longi at Permut Presentations on

6 | October 16, 2002; Martha Chang on June 5, 2003; and Laura Rister at Miramax Films on

7 | July 23, 2003.

8 | 39.   Mr. Leipzig also submitted the Hefter Screenplay directly to Steve Barnett on

9 | July 31, 2001.  Mr. Barnett worked with Polone, defendant Pariah's owner, on "My Super

10 | Ex Girlfriend" (2006).  Polone was a producer and Mr. Barnett was a post-production

11 | supervisor.  By virtue of the relationship between Mr. Barnett and Polone, defendants had a

12 | direct avenue of access to the Hefter Screenplay just prior to the time-frame in which the

13 | PREMIUM RUSH project was set up.

14 | 40.   Because the Hefter Screenplay was circulated only through industry channels,

15 | and contained an express notice advising the recipient that it could not be used without

16 | permission (see infra, ¶ 180-81), anyone who obtained a copy of the Hefter Screenplay

17 | would have known that it was for sale and could not be used and/or exploited without

18 | compensating plaintiff and possibly Warner Bros.  The Healy Screenplay (a draft) was not

19 | widely circulated in Hollywood but was obtainable from or through Warner Bros. (either

20 | from an individual at Warner Bros. or through the Warner Bros. "Story Library": the cover

21 | of the Healy Screenplay is stamped "Received" into the "STORY LIBRARY" on March 9,

22 | 2000).

23 | 41.   At no point did defendants request plaintiff's consent, or compensate

24 | plaintiff, to exploit any intellectual property from THE ULTIMATE RUSH in PREMIUM

25 | RUSH or to use the Healy or Hefter Screenplays to any extent, or for any purpose, in

26 | creating a motion picture.

27 |

28 |

**The Extensive Substantial Similarities Between "The Ultimate Rush" And The "Premium Rush" Screenplay/Film.**

42.     The similarities between THE ULTIMATE RUSH and PREMIUM RUSH are pervasive, are striking, go far beyond any arguable unprotectable necessities of the themes, and belie any claim of literary accident.  The following allegations merely summarize some of the obviously non-coincidental similarities among THE ULTIMATE RUSH, PREMIUM RUSH-DRAFT (written by defendants during 2009 and accessible on the Internet) and PREMIUM RUSH-FINAL.

**Plot Similarities.**

43.     The plot of a novel, screenplay or film is its plan or main story.

44.     The plot of PREMIUM RUSH is the plot of THE ULTIMATE RUSH.  The only plot variation between the works is that PREMIUM RUSH omits a "hacker" aspect that is explored in THE ULTIMATE RUSH.  The omission of a plot aspect or "subplot" is an extremely common and well-recognized feature of novel-to-film adaptations, where due to time constraints and other cinematic considerations, some material may be left out by the adapter.  The following allegations summarize some, but certainly not all, of the plot duplication.

45.     In THE ULTIMATE RUSH, the protagonist ("Chet"), a male San Francisco "bike messenger. . . .  On rollerblades," in his 20s, declares that the "rush" which accompanies a close call with death makes the risk worthwhile.  In PREMIUM RUSH-DRAFT, the protagonist ("Wilee"), a male New York bike messenger in his 20s, declares that the "rush" which accompanies a close call with death makes the risk worthwhile.  In PREMIUM RUSH-FINAL, Wilee declares that he likes to ride a bike with no brakes, that he "[c]an't stop" and that "people . . . have no idea why anyone would . . . risk their lives in a death maze . . . ."  At the same point in the plot, both the Healy and Hefter Screenplays have Chet thinking, among other similar thoughts, that his messenger job will "crush you to a pulpy clot . . . and gives you a rush like no drug ever made . . . people think I'm crazy . . . ."

46.     Both THE ULTIMATE RUSH (including the Healy and Hefter Screenplays) and PREMIUM RUSH use the same incident to dramatize the risks inherent in being a messenger.  THE ULTIMATE RUSH dramatizes this risk when Chet squeezes between a bus and parked cars, then acrobatically dodges a car door that a male passenger opens directly in front of him.  In PREMIUM RUSH-DRAFT, Wilee squeezes between a cab and parked cars, then acrobatically dodges a car door that has been opened by a passenger directly in front of him.  In PREMIUM RUSH-FINAL, Wilee squeezes between taxis, then acrobatically dodges a male passenger's door opened directly in front of Wilee.

47.     Both male protagonists are romantically interested in the same type of woman.  In THE ULTIMATE RUSH, Chet pursues an aggressive, fit, sexy, confident, tough, punkish, muscular, tank-topped, bike-helmeted, love interest, Ho (despite her name, Ho is not Asian).  In PREMIUM RUSH, Wilee pursues an aggressive, fit, sexy, confident, tough, tattooed, 20s-something, muscular, tank-topped, bike-helmeted, love interest, Vanessa.  Both THE ULTIMATE RUSH and PREMIUM RUSH-FINAL use virtually identical dialogue to establish that the protagonists care for their love interest's safety.  THE ULTIMATE RUSH: [Chet] "I notice a road rash on her wrist.  'What happened here?' I ask . . . .  [Ho] 'Chalk-it up as a battle scar'"; PREMIUM RUSH-FINAL: "WILEE (panting) Hey what happened to you here?  VANESSA  Ah.  (scoffs).  WILEE You use that goddamn brake again?  VANESSA Yeah, I took that shit off."  In both THE ULTIMATE RUSH and PREMIUM RUSH-FINAL, the protagonist contrasts his messenger lifestyle with the life of a businessman to his love interest.  THE ULTIMATE RUSH: "You know, I meet a suit like that Levy, who is like total dorkamundo, and I act like I'm all way hipper than he is; PREMIUM RUSH-FINAL: "WILEE . . . when I see a guy in a gray business suit, my age, makes my balls shrivel up into my abdomen."  In both THE ULTIMATE RUSH and PREMIUM RUSH-FINAL, the protagonist competes for his love interest with a male character who is disliked by Chet/Wilee.  Chet's feelings of competition are revealed in the Novel when Chet thinks, "Call me a caveman, but I can't help but gnash my teeth with pugnacity when Ho turns her little cupcake bottom to the crowd, and I see every dude's

eyes go wide." The Healy and Hefter Screenplays expand the rivalry Chet experiences with male characters. In the Hefter Screeenplay, the character Deke is established as Chet's competition for Ho. The Healy Screenplay established Chet's antagonist, Levy, as desirous of Ho (Ho: "Levy just asked me out." Chet: "You're not going, are you?" Ho: "Of course, I'm going"). PREMIUM RUSH-FINAL copies this rivalry through Wilee's messenger nemesis, Manny, who competes with Wilee for Vanessa's attention. Manny, referring to a delivery package states, "Yo, it isn't yours, it's mine now. Like your girlfriend."

48.     In THE ULTIMATE RUSH, Chet and Spider, Chet's good-looking co-worker/bike messenger, taunt and compete with each other for deliveries. In PREMIUM RUSH, Wilee and Manny, Wilee's good-looking co-worker/bike messenger, taunt and compete with each other for deliveries. In both works, the male messenger protagonists receive assignments from a dispatcher with the same personality. In THE ULTIMATE RUSH, both Chet and Spider get delivery assignments from Mel, their stressed-out, volatile and dismissive dispatcher. In PREMIUM RUSH, both Wilee and Manny get delivery assignments from Raj ("Raj" in PREMIUM RUSH-FINAL and the Film and "Farhad" in PREMIUM RUSH-DRAFT), their stressed-out, volatile and dismissive dispatcher. While Raj's personality is less volatile in PREMIUM RUSH-FINAL, Raj assumes a more obscene character: "When is Raj going to climb mount Vanessa, hm?" While Raj's personality has changed in PREMIUM RUSH-FINAL, Raj's character in PREMIUM RUSH-DRAFT was the same as Mel's in THE ULTIMATE RUSH, which is probative of access, direct copying and willful infringement.

49.     In THE ULTIMATE RUSH, one day at work, and as Chet's last delivery that day, Mel gives Chet an extremely time-sensitive package to deliver, which another messenger has declined. Chet accepts the assignment because he is desperate for money. Mel tells Chet that if the delivery is made on-time, Chet will be paid much more than his usual compensation. In PREMIUM RUSH-FINAL, one day at work, and as Wilee's last delivery of that day, Raj gives Wilee an extremely time-sensitive package to deliver, which another messenger has declined. Wilee accepts the assignment because he is desperate for

1 money.  Raj tells Wilee that if the delivery is made on-time, Wilee will be paid much more

2 than his usual compensation.

3      50.     During the course of the deliveries, both protagonists encounter similarly

4 described antagonists.  In THE ULTIMATE RUSH, during Chet's delivery (to a "Dr.

5 Chen" at a Chinese restaurant), Chet is confronted by (and makes intense eye contact with)

6 a mysterious, intimidating man in a "perfectly tailored suit" and loud tie.  In PREMIUM

7 RUSH, during Wilee's delivery (to a "Sister Chen" in Chinatown), Wilee is confronted by

8 (and makes intense eye contact with) a mysterious, intimidating man in a pinstripe suit and

9 loud lavender shirt.  During the course of the deliveries, both protagonists are chased

10 throughout the city, both become suspicious that their packages contain illegal contents, and

11 both strategize with their love interests about how to handle the situation.

12      51.     Both protagonists go to the police station to file a report about the chase.  At

13 the police station, however, both protagonists learn that the police are complicit in the

14 underlying activity.  In THE ULTIMATE RUSH, Chet learns at the police station that

15 officer Gina Corlini, Mel's sister, is involved in the scheme.  Chet flees the station.  In

16 PREMIUM RUSH, Wilee learns at the police station that the man who chased him

17 throughout the city, Monday, is a cop who is involved in the scheme.  Wilee flees the

18 station.  In both THE ULTIMATE RUSH and PREMIUM RUSH, the protagonists are

19 chased by law enforcement officers after they leave the police station, past a group of

20 school children.  In THE ULTIMATE RUSH, Chet contacts his dispatcher, Mel, for

21 assistance – but gets only "Okay, Chet, relax.  Where are you?"  In PREMIUM RUSH-

22 FINAL, Wilee contacts his dispatcher, Raj, for assistance – but gets nothing more than

23 "Wilee? Where are you?"  In both THE ULTIMATE RUSH and PREMIUM RUSH, the

24 protagonists both mistakenly believe that they are transporting drugs and are being pursued

25 by drug dealers.

26      52.     In THE ULTIMATE RUSH, Chet and his love interest, Ho, discuss the

27 situation and conclude that Chet is being used as a pawn in a financial fraud, implemented

28 through Chet's delivery of computer disks with secret financial codes to Dr. Chen.  The

1   illegal transaction is part of an insider trading scheme (a newsworthy crime in the 1990s).

2   In PREMIUM RUSH, Wilee and his love interest, Vanessa, discuss the situation and

3   conclude that Wilee is being used as a pawn in a financial fraud, implemented through

4   Wilee's delivery of a movie stub with a secret financial code to Sister Chen.  The illegal

5   transaction is part of a money-laundering (Hawala) and human trafficking scheme

6   (newsworthy crimes in the 2000s).  Based upon this determination, both protagonists

7   recognize they are in possession of valuable contraband for which their antagonists will kill.

8   In the Hefter Screenplay the corrupt bankers swapped their assets into bearer bonds: "Y'see,

9   if you have a bearer bond in your possession, it's yours.  It's almost like having a signed

10  blank check.  In this case a check for two million dollars."  In PREMIUM RUSH-FINAL,

11  Nima receives a movie ticket from Leung (a "banker" involved in the conspiracy), who

12  after writing a code on it states "*This ticket now is money.*"  The financial function of both

13  the bearer bonds and the coded movie ticket are the same – to allow a financial transaction

14  to proceed under the radar and outside the view of the legitimate system.

15       53.     Both THE ULTIMATE RUSH and PREMIUM RUSH ultimately bring

16  "double pursuit" into the plot, which has the effect of raising the level of action and the risk

17  or "stakes."  In THE ULTIMATE RUSH, the protagonists are chased simultaneously by

18  gangsters supported by corrupt cops, plus non-corrupt law enforcement, for different

19  reasons.  In PREMIUM RUSH, the protagonists are chased by two different segments of the

20  NYPD, the corrupt cop who is involved with Asian gangsters and non-corrupt cops, for

21  different reasons.

22       54.     Both works end with complex multi-party chase scenes in which the

23  protagonists are chased by multiple pursuers (law enforcement and financial criminals),

24  who alternately seek to coerce and bargain with the protagonists for possession of the

25  contraband.  Both pursuits end in isolated urban areas where it is clear that either the

26  protagonists or antagonists will fail in their goals (the protagonists' goal being survival and

27  the antagonists' goal being to recover the contraband).  In both works, the protagonists

28  survive and retain the contraband, while the antagonists die and fail to obtain the

1  contraband.  The decisive plot point in both works is that a swarm of messenger-friends

2  appears and intervenes in the final confrontation, shifting the balance in favor of the

3  protagonists.

4  **Similarities Of Characters.**

5         55.      The characters in a novel, screenplay or film include the persons and animals

6  in the work.

7         56.      In a mid-2005 video interview, defendant Koepp was asked: "Now for like all

8  our aspiring screenwriters that might be watching this right now, what do you personally

9  find to be like the most challenging aspect of being a screenwriter?"  Defendant Koepp

10  responded, "Characters.  You know, coming up with good, believable characters who will

11  drive your action instead of just react to it is the hardest thing in the world.  I think that

12  when you meet – if I had it to do over again I would start keeping a journal from a very

13  young age about any interesting person I ever met so I could rip off their personhood and

14  put it in a movie.  I just think it's the hardest thing to have any kind of insight into human

15  behavior is really difficult."  PREMIUM RUSH was a "rip-off" of the interesting and

16  unique characters developed by plaintiff in THE ULTIMATE RUSH, and who drive the

17  action in the Novel.

18         57.      The following allegations merely summarize some of the more obvious and

19  undeniable ways in which PREMIUM RUSH copies the significant characters in THE

20  ULTIMATE RUSH.

21         58.      **Main Male Protagonists (Chet And Wilee).**  The male protagonists in both

22  THE ULTIMATE RUSH and PREMIUM RUSH share the same personality traits,

23  characteristics and physical attributes.  Both protagonists are in their 20s and are highly-

24  educated, yet surprisingly work as low-paid messengers.  In THE ULTIMATE RUSH, at a

25  critical point, Chet exclaims, "But I'm a college graduate, dammit!!"  Chet was once a

26  talented computer code breaker who rejected his career potential for the lifestyle of a

27  messenger.  The casting call for the PREMIUM RUSH Film describes that Wilee attended

28  Columbia Law School, but never took the bar (not coincidentally, the printed versions of

1    THE ULTIMATE RUSH disclose the unusual fact that its author, Joe Quirk, "studied law

2    in St. Louis (but never became a lawyer)").  Dialogue in PREMIUM RUSH-FINAL

3    confirms that Wilee was a highly-educated person who went to law school but "never took

4    the bar."

5          59.    Both protagonists subordinate any fear of death to obtain the rush that comes

6    with a risky lifestyle.  They are confident, aggressive and daring.  They both grab on to

7    moving vehicles, hitch rides to outrace their competitors and take the stairs when nobody

8    else would be able to navigate stairs on bike or skate wheels.  Both protagonists are in

9    excellent physical shape and have extraordinary reflexes and agility.  While both

10   protagonists are libidinous, they are shy, insecure and awkward when expressing feelings

11   for their love interest.  The protagonists' athletic abilities, along with their stamina and

12   flexibility, make them adept at conquering animate and inanimate obstacles they encounter

13   in an urban context.  Both works describe the protagonists' ability to maneuver backward

14   on their roller-blades/bike as required.  Both protagonists have a defiant attitude toward

15   authority, but also have a compassionate side and a willingness to sacrifice for moral

16   principles.  Both protagonists are competitive with the other messengers.  Both protagonists

17   are reliable messengers.  Both protagonists are vulgar and sarcastic (swearing often and

18   using homemade variations of the word "dick").  Both protagonists are given nicknames

19   that are consistent with an aggressive character or persona (Chet in THE UTLIMATE

20   RUSH is "Cannon," Wilee in PREMIUM RUSH is "Coyote").  Both protagonists have an

21   atypical relationship with their bosses, one in which both the boss and employee are vulgar,

22   impatient and irritable to one another.

23         60.    **Female Love Interests (Ho And Vanessa).**  The male protagonists in both

24   works each have a single female love interest, Ho in THE ULTIMATE RUSH and Vanessa

25   in PREMIUM RUSH.  The female love interests are both in their 20s and are aggressive, fit,

26   sexy, confident, tough, punkish and muscular, wear tank-tops and bike-helmets, and have

27   straight-talking, provocative and non-conformist personae.  Both female protagonists also

28   have kind, loyal and nurturing qualities.

61.     In both works, the female protagonist is, or becomes at a critical plot point, a daring messenger.  In THE ULTIMATE RUSH, Ho performs stunts on a skateboard and is portrayed as a daredevil.  As the plot unfolds, Ho becomes a messenger in an effort to help Chet investigate the criminal activity in which he is involved and to develop evidence.  In PREMIUM RUSH, Vanessa is described in the film's casting call as "a daredevil bike messenger" and helps Wilee investigate the criminal activity in which he is involved and to develop evidence.

62.     Both female protagonists also worry about their job choices and financial security.  In THE ULTIMATE RUSH, Ho worked at a day-care, but gave up that job to pursue her true passion, playing in a music band.  However, Ho worries about how long her lifestyle will sustain her and recognizes that she has "to make sure I have a steady income." Likewise, in PREMIUM RUSH-DRAFT, Vanessa only "does the job because her family's counting on her for the money."  Vanessa yearns to finish college and eventually obtain a secure desk job.  In PREMIUM RUSH-FINAL, Vanessa proclaims that "I'm gonna get a decent job and sit behind a desk all day."

63.     Both female protagonists have feelings for a significant character named "Wily/Wilee."  In THE ULTIMATE RUSH, Ho has a canine companion named "Wily." The relationship between Ho and Wily pervades both the plot and the character development in THE ULTIMATE RUSH.  Wily is an active participant at virtually every major plot point in THE ULTIMATE RUSH, and often is used as a foil in critical character development scenes.  In PREMIUM RUSH, Vanessa shares an intimate companionship with "Wilee," the male protagonist, who is involved in virtually every major plot and character scene.

64.     **Competitor Messengers (Spider And Manny).**  In both works, the male protagonists each compete with a male messenger for deliveries.  In THE ULTIMATE RUSH, this character is Spider.  In PREMIUM RUSH, this character is Manny.  In THE ULTIMATE RUSH, Spider is described as a "blond, tanned, California boy . . . ."  Spider is overly confident.  In PREMIUM RUSH, the casting call describes Manny as a "gorgeous,

1    muscular, athletic bike messenger, 'the perfect specimen of male beauty.'" He is a "cocky,

2    fit young man." Both pairs of the protagonist/messenger competitors (Chet/Spider and

3    Wilee/Manny) banter, bait and taunt each other, often inventing humorous composite word-

4    plays. In both the Hefter Screenplay and PREMIUM RUSH-FINAL, in the initial contact

5    between the protagonist and antagonist-messenger, one calls the other an "asshole." In the

6    Healy Screenplay, the competitor messenger publicly mocks Chet. In both THE

7    ULTIMATE RUSH and PREMIUM RUSH-FINAL, the competing messengers are

8    involved in a chase – in which one of the messengers wipes-out after being caught in a dog

9    leash.

10          65.    **Chinese Organized Crime Antagonists.** Both works also feature Chinese

11   organized crime gangs, which have similar plot functions, structures and characteristics of

12   the actors. In both works, the Chinese organized crime gangs are involved in serious

13   financial crimes using what appear to be insignificant tools to carry out their schemes. In

14   THE ULTIMATE RUSH, information is traded by exchanging information on a computer

15   disk. In PREMIUM RUSH, information is traded by putting a smiley face on a movie

16   ticket. Both schemes require the Chinese organized crime gangs to transfer their

17   information physically and quickly, in a sealed envelope, by messenger to another location

18   in the city. The Chinese organized gangs have set up similar fronts for their criminal

19   activities, a Chinese restaurant (THE ULTIMATE RUSH) and a Chinese nail salon

20   (PREMIUM RUSH).

21          66.    **Stressed/Abrasive Dispatchers (Mel And Raj).** Both works feature the

22   same dispatcher (the boss who hands out delivery assignments to the messengers). In THE

23   ULTIMATE RUSH, Mel, the dispatcher, is a "coked-up stock market player with rabies

24   [] . . . [who] is barking into an innocent phone" behind a desk. In PREMIUM RUSH-

25   DRAFT, Raj, the dispatcher, is "caffeinated and irritated, wears a [telephone] headset and

26   sits at an L-shaped table . . . ." PREMIUM RUSH-FINAL adds Raj talking into a headset

27   when Wilee walks in.

28

67.   **Corrupt Law Enforcement Antagonists (Gina And Monday).**  In both works, the protagonists encounter a corrupt cop at the police station, Gina Corlini in THE ULTIMATE RUSH, and Bobby Monday in PREMIUM RUSH.  Both corrupt cops seek to benefit financially from the schemes orchestrated by the Chinese organized gangs.  Both corrupt cops actively conceal their complicity from their fellow officers, but operate under color of law.  At the same point in both works, both corrupt cops raise the stakes facing the protagonists by eliminating the possibility of police protection (and establishing the police as antagonists).

68.   **Wily and Wilee.**  Major characters in both THE ULTIMATE RUSH and PREMIUM RUSH have the same name (spelled "Wily" in THE ULTIMATE RUSH and "Wilee" in PREMIUM RUSH).  In THE ULTIMATE RUSH, "Wily" is the female protagonist's dog – an important character who, inter alia, saves the lives of the two human protagonists and is the object of great affection by the female protagonist.  In PREMIUM RUSH, "Wilee" is the male protagonist, who drives the plot and who is the object of great affection from the female protagonist.  The name Wily/Wilee is extremely uncommon.  The independent use of the name Wily/Wilee for important characters in both works is implausible to begin with, and in combination with the other items identified in this Complaint (and others not identified but equally present), negates independent creation of PREMIUM RUSH.

69.   Both THE ULTIMATE RUSH and PREMIUM RUSH-DRAFT refer to a phony personal ad for Wily/Wilee.  In THE ULTIMATE RUSH, the male protagonist creates a phony, humorous "Wanted: Roommate" ad in his head for the female protagonist's dog, Wily.  In PREMIUM RUSH-DRAFT, the male protagonist creates a phony, humorous personal ad for himself (Wilee).  A scene with phony personal ads is not commonplace, and the coincidental use of this scene in both works (both involving the character named Wily/Wilee) is implausible and highly-probative of copying by the defendants.  Although this scene was dropped from PREMIUM RUSH-FINAL, it is probative of access, direct copying and willful infringement.

**Scene And Sequence Of Events Similarities.**

70.     The sequence of events in a novel, screenplay or film is the order of succession in which things happen.  THE ULTIMATE RUSH and PREMIUM RUSH both have the following scenes (presented in a similar sequence in both works), among numerous others.

71.     **Opening Delivery Scenes To Establish Main Characters' Addiction To "The Rush."**  Both THE ULTIMATE RUSH and PREMIUM RUSH open with scenes describing a messenger wiping out and smashing his head against the city streets in front of a crowd of people.  THE ULTIMATE RUSH begins with a delivery run down "Watermelon Hill.  So named when some hurtling skateboarder burst his head spectacularly against the curb in front of a hundred witnesses last year."  PREMIUM RUSH-DRAFT opens with Wilee riding along on a delivery "until gravity grabs him, speeds him up, and SPIKES him to the pavement, CRUNCHING onto his back in the middle of Seventh Avenue, SMACKING his head against hard city street. . . .  [T]here's chaos all around . . . ."  PREMIUM RUSH-FINAL copies the opening of the Hefter Screenplay based on THE ULTIMATE RUSH – in which a courier on a delivery run "soars" or "flies" over a low camera (see infra, ¶ 124).  The protagonists next equate the "rush" from their work with a sexual rush.  In THE ULTIMATE RUSH, Chet declares, among other things, "I lust for the ultimate rush."  In PREMIUM RUSH-DRAFT, Wilee declares "'But the rush I get when I slip out of something I got no right to survive?  There's no feeling on earth like it. . . .  With the possible exception of looking at you [his love interest].'"  In PREMIUM RUSH-FINAL, Wilee declares, inter alia, "I like to ride . . .Fixed gear, steel frame, no brakes . . . .  Can't stop . . . .  Don't want to either . . . .  [m]ost people just wish we'd get off the street . . . .  [t]hey have no idea why anyone would . . . risk their lives in a death maze . . . ."  These scenes showcase the protagonists' occupational hazards – and a purported benefit of a job that supplies "the rush."

72.     **Scenes To Establish Main Characters' Attitude, Job Challenges And Goal.**  Once the protagonists' addiction to "the rush" is established, both works describe a

scene, energized by aggressive music, in which the protagonists launch themselves with changing streetlights, burst forward into motion and dodge a group of sedentary pedestrians crossing the street.  A scene from THE ULTIMATE RUSH sets the tone:  "I don the headphones.  My skull becomes an angry hornet's nest of speed metal riffs.  They are shut out.  The first two lights go green.  The last two go red.  C'mon, c'mon.  Then the third and middle traffic light – green!  I'm off!  Instant hyperspeed . . . .  I rocket past a long line of briefcase trudgers . . . .  The music is inside me.  Bass drums are thudding in my rib cage, electric guitars shredding blood from my eardrums, bass guitars crackling my skull with each pluck . . . .  A flock of businesswomen presume to cross my street . . . I tear past . . . ."  The PREMIUM RUSH-DRAFT delivery scene proceeds the same way: "Wilee, on the bike, darts his eyes up to the red light.  Then to the left, to the slowing crosstown traffic.  To the right, to the IRRITATING PEDESTRIANS as they finish getting their fat asses out of his way.  The feet twitch on the pedals, the light turns green – and the TICKING explodes into music.  Wilee's bike bursts forward . . . ."  Both protagonists then travel at high-speed throughout the city, pushing themselves relentlessly until both of them experience exhaustion in their thigh muscles.  In THE ULTIMATE RUSH, the protagonist says, "My thigh muscles twist like steel cables."  In PREMIUM RUSH-DRAFT, the protagonist "drafts [a truck] for a second to rest his thighs."  PREMIUM RUSH-FINAL omits some of the scene-setting description of PREMIUM RUSH-DRAFT (which is captured in the imagery of the PREMIUM RUSH Film itself).  But, identically to the Novel, the Hefter Screenplay and PREMIUM RUSH-DRAFT incorporate the sequence with shots of Wilee riding fast through crowded city streets, e.g. "SCENE 11 – EXT. MANHATTAN STREETS. . .CAMERA TILTS UP TO REVEAL WILEE RIDING HIS BIKE BG. THROUGH TRAFFIC. CAMERA FOLLOWS HIM AS HE WEAVES BETWEEN CARS."

73.     The protagonists also encounter similar physical obstacles.  Not only do the protagonists both squeeze between another vehicle and parked cars as they attempt to make an on-time delivery, but they are both confronted by the same critical obstacle: a car door

1   unexpectedly opens, directly in their paths.  In both THE ULTIMATE RUSH and

2   PREMIUM RUSH, the protagonists use their unusual dexterity to avoid hitting the open

3   door.  The unusual similarities in the "car door" scenes are described in more detail in

4   Paragraph 46, above.

5        74.    The messengers in both works require their customers to provide a receipt to

6   verify the delivery.  In THE ULTIMATE RUSH, Chet states to the customer, "'Yo!

7   Where's my receipt!'"  In PREMIUM RUSH-DRAFT, Wilee states to the customer, "'Ya

8   gotta sign.'"  In PREMIUM RUSH-FINAL, Wilee says "Sign here and print your name

9   under it, please."

10       75.    Both protagonists then unwind at a similar urban, grungy bar with their love

11  interest where they discuss their risky lifestyle.

12       76.    **Scenes To Establish The Secrecy Of The Package Contents.**  Both works

13  similarly establish that secrecy of the package contents is paramount.  THE ULTIMATE

14  RUSH establishes early that the two commandments of messengership are: (1) "Ask no

15  questions" and (2) "Never look inside the package."  This theme is developed later in

16  dialogue in which a recipient of the package instructs Chet that "'These are very private

17  deliveries, and require the upmost secrecy. . . .  I am told that couriers are not to be

18  concerned with the contents of their packages.'"  The protagonist in PREMIUM RUSH-

19  DRAFT and PREMIUM FRUSH-FINAL describes the same rule, at the same point, to a

20  supposed "investigator" who asks for the delivery envelope: "'Yeah, the thing is, once it

21  goes in the bag it's gotta stay in the bag unless I hear from my dispatcher. . . .  [and FROM

22  PREMIUM RUSH-DRAFT]:  "Look man, they call the company 'Security Courier.'  The

23  security part is that once people give us their shit we don't just hand it out to random

24  strangers on the street, you get it?'"

25       77.    **Scenes to Establish A Competitive Messenger And Circumstances Of**

26  **The Key Delivery.**  In THE ULTIMATE RUSH, the dispatcher, Mel, gives Chet an urgent

27  assignment because Chet was specifically requested by the customer, based on Chet's

28  outstanding performance in a prior job (a job which Chet's competitor-messenger, Spider,

1  refused). Chet takes it – he is desperate for cash. In PREMIUM RUSH-DRAFT, the

2  dispatcher, Raj, gives Wilee an urgent assignment because the customer specifically

3  requested Wilee based on his performance in a prior job (a job for which Manny was

4  unavailable). Wilee takes it – he is desperate for cash. Chet must deliver to "Dr. Chen."

5  Wilee must deliver to "Sister Chen." In PREMIUM RUSH-FINAL, Raj gives Wilee and

6  urgent assignment because the customer specifically requested him. Wilee takes it and must

7  deliver to "Sister Chen."

8        78.  **Scenes To Establish Brutal And Intimidating Antagonists.** Both

9  protagonists, when they first make eye contact with the antagonists, back out of a

10  confrontation, despite their cocky personalities. In THE ULTIMATE RUSH, Chet is

11  confronted by Data, "a gargantuan olive-skinned brute . . . and he's wearing a perfectly

12  tailored suit, with a striped green, white, and red tie . . . . He looks deep into my pupils and

13  espies my innermost animal nature . . . ." Chet then sizes up the adversary and determines

14  he cannot fight this adversary. PREMIUM RUSH-DRAFT has the same scene. The

15  protagonist, Wilee, is confronted by Monday, "A good-looking guy, fortyish, in a subtle

16  pinstripe suite and unsubtle lavender shirt . . . striding toward him . . . . ." Monday tells

17  Wilee, "'I'm the guy you don't fuck with.'" PREMIUM RUSH-DRAFT describes the same

18  eye contact: "A moment of eye contact as Wilee sizes up the threat level. Decides it's

19  rather high." PREMIUM RUSH-FINAL largely omits directions for the actors, and does

20  not include instructions on the subject of eye contact (which, therefore, must be determined

21  from the Film).

22        79.  **Scenes To Establish Complicity Of Law Enforcement.** In both works the

23  protagonists learn that law enforcement is complicit in the criminal activities at the same

24  plot point and in the same manner. In THE ULTIMATE RUSH, Chet and Ho go to a police

25  station to make a report. They walk through a crowded waiting room to talk to the officer

26  in charge, who sits in "a glassed-in office." Chet and Ho then notice the badge on the

27  officer and quickly realize that the policewoman in charge is the sister of dispatcher Mel,

28  Chet's boss, and that she is in cahoots with the criminals. Chet and Ho flee without making

27

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

a report.  In PREMIUM RUSH-DRAFT, Wilee goes to a police station to make a report.
Wilee walks through a crowded waiting room to talk to the officer in charge, who sits
behind a "Plexiglass" window.  Wilee then notices a badge on Monday, the man who
chased him, and quickly realizes that Monday is a cop and that the policewoman on duty is
a colleague of Monday.  Wilee flees the station without making a report.  In both works, the
protagonists realize that law enforcement will not help them out of the predicament in
which they are ensnared.  In PREMIUM RUSH-FINAL, Wilee discovers that Monday is a
law enforcement officer when Wilee looks at a photo he snapped of Monday's official
license plate.  The action in PREMIUM RUSH-FINAL is otherwise the same as in the
earlier draft.

80.  **Schoolchildren and Bus Escape Scene.**  In THE ULTIMATE RUSH, after
Chet realizes that law enforcement is complicit, he flees the police station without making a
report, races through a group of children and escapes by boarding a bus.  In PREMIUM
RUSH-FINAL, after Wilee realizes that law enforcement is complicit, he flees the police
station without making a report, races by a group of children and escapes by hanging onto a
bus.

81.  **Scenes To Establish Dispatcher's Refusal To Assist Messenger.**  In both
works, the protagonists seek help from the dispatcher upon realization that their deliveries
may involve contraband.  In THE ULTIMATE RUSH, Chet calls Mel to inform him about the
Chinese gangsters and to seek Mel's help.  Chet quickly realizes that Mel is not going to assist
him, and Chet hangs up on Mel.  Chet then proceeds to investigate the activities with Ho's help.
In PREMIUM RUSH, Wilee calls Raj to report that he is being chased, and questions Raj
about the contents of the delivery.  He also tells Raj that he is not going to make the
delivery because he thinks it involves contraband.  Raj refuses to help him, and Wilee hangs
up on him.  Wilee then proceeds to investigate the circumstances of the delivery with
Vanessa's help.

82.  **Scenes To Establish The Protagonists' Romantic/Facetious Appeal To
Their Love Interests.**  Both works next establish that the protagonists, while pursuing the

1   "rush," facetiously claim to their love interests that they actually want a normal life and
2   could change.  In THE ULTIMATE RUSH, Chet runs away from "Spock" and "Data" (who
3   are chasing Chet).  Chet meets up with Ho and confides "'I've changed my mind . . . . I
4   don't want the ultimate rush.  I want safety.  I want peace.  I want boredom.  I want to get
5   thrilled over herbal teas and cozy wool socks like Marin people.  Dammit, I want my
6   mommy.'"  In PREMIUM RUSH-DRAFT, in the midst of a Chase with Monday, Wilee
7   tells Vanessa, "'I'll be normal . . . .  I'll buy a rabbit!  I'll get some furniture from Pottery
8   Barn, and we'll have our friends over for Game Night, and when I can't sleep I'll come
9   downstairs in my pajamas and pour a big glass of milk and cut myself a slice of that cake
10   you make and -."  Although this scene was dropped from PREMIUM RUSH-FINAL, its
11   inclusion in PREMIUM RUSH-DRAFT is probative of access, direct copying and willful
12   infringement.

13        83.    **Scenes In Which The Love Interests Assist The Protagonist.**  In both
14   works, the love interests become involved in the criminal activity to assist the protagonist.
15    In THE ULTIMATE RUSH, Ho becomes an undercover messenger (also working for Mel)
16   and delivers the coded packages to help Chet investigate the fraudulent scheme.  In
17   PREMIUM RUSH-DRAFT, Vanessa (who is a messenger) assists Wilee to investigate the
18   scheme and supplies important information.  In PREMIUM RUSH-FINAL, Vanessa helps
19   Wilee avoid being apprehended by the police and deliver the ticket.  As the female love
20   interest volunteers to become involved in the dangerous criminal activity, the protagonists
21   respond the same way.  In THE ULTIMATE RUSH, Chet says to Ho, "'I'm so sorry, Ho.  I
22   don't want them to kill you.'"  In PREMIUM RUSH-FINAL, Wilee says, "Baby, this
23   situation sucks.  I don't want you anywhere near it."

24        84.    **Scene To Describe The Nature Of The Crimes.**  The central financial
25   scheme in both works involves the delivery of information that is encoded on commonplace
26   media to enable illegal financial transactions.  In THE ULTIMATE RUSH, the delivery
27   envelope contains a computer disk with encoded information, which instructs Chinese
28   criminals and investment bankers.  In PREMIUM RUSH, the envelope contains a movie

29

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

1   ticket with encoded information, which instructs Chinese human traffickers and

2   underground bankers.  In both THE ULTIMATE RUSH and PREMIUM RUSH a

3   contestant for the valuable delivery package is beholden to Asian gangs.

4       85.   **Violent Confrontation Scenes Between Dirty Cops And Organized Asian**

5   **Gangs In The Scheme.**  In both THE ULTIMATE RUSH and PREMIUM RUSH, violent

6   conflicts emerge between the Chinese gangsters involved in the criminal activity and the

7   Caucasian law enforcement participants.  In THE ULTIMATE RUSH, Mel Corlini is killed

8   by the organized Chinese gangs, and his sister, law enforcement officer Gina Corlini, seeks

9   revenge by launching a series of violent police raids on Chinese gangsters.  In PREMIUM

10  RUSH-DRAFT, Monday kills a Chinese "goon" and in PREMIUM RUSH-FINAL, an

11  "Enormous Asian Man.'"  In both versions of the screenplay, Monday attacks Nima, whose

12  Hawala money Monday has sought to intercept.  At the end of PREMIUM RUSH, the

13  Asian gangsters murder Monday, the dirty cop.

14      86.   **Final Chase, Negotiation, Confrontation And Celebration Sequence.**

15  Both works conclude with similar final chase scenes, negotiations, final confrontations, the

16  protagonists' victory and celebrations.  In THE ULTIMATE RUSH, gangsters chase Chet

17  and Ho to obtain the coded computer disks.  In PREMIUM RUSH, Monday chases Wilee to

18  take possession of the package containing the coded ticket.  In THE ULTIMATE RUSH,

19  Ho is held hostage and used as a bargaining chip to obtain secret information.  Chet makes a

20  deal with the gangsters for Ho's release: "'You deliver me Ho, and I deliver you the safe-

21  deposit key.'"  In PREMIUM RUSH-DRAFT and PREMIUM RUSH-FINAL, Wilee's bike

22  is confiscated and used as a bargaining chip to obtain the secret information.  Wilee makes a

23  deal with Monday for the bike's release: "'Just get me my bike . . .  Get me my bike! . . . I'll

24  get you the ticket." I want my bike first . . . .  That's all.  I don't care about anything or

25  anybody else.  Get me my bike and I'll get you the ticket.'"  At the key moment in this

26  discussion, the antagonist's question to the protagonist is identical.  In THE ULTIMATE

27  RUSH, the antagonist asks Chet, "How do we make this [exchange] transaction?"  In

28

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

PREMIUM RUSH-FINAL, the antagonist asks Wilee, "How do we make that [the exchange] happen?"

87.   Both works coalesce with the protagonists confronting the antagonists and ambushing them.  In THE ULTIMATE RUSH, Chet arranges for all of the parties involved to meet in a public location.  In PREMIUM RUSH, the parties all coalesce at a public location.  In both works, the protagonists are confronted by armed antagonists who appear ready to kill the protagonists.  In THE ULTIMATE RUSH, a swarm of skaters – whose intervention Chet arranges with a rapid series of telephone calls – appears and saves Chet and Ho.  The skater swarm scene is described as follows:  "They charge forward en masse, a tight phalanx of draft dodgers beneath the overhead hurl of bullets.  They gather around Ho and Wily in a big bunch.  I can hear nothing over the racket."  In PREMIUM RUSH-DRAFT and PREMIUM RUSH-FINAL, Wilee, faced with Monday's revolver, is saved from harm by a swarm of fellow bike messengers – whose intervention Wilee and Vanessa had arranged with a rapid series of telephone calls.  The bike-swarm scene is described in PREMIUM RUSH-Draft as follows:  "A BLACK CLOUD OF CYCLISTS APPEARS AT THE END OF THE STREET . . . .  In seconds, they're everywhere, buzzing around, in front of, in back of, and in between Wilee and Monday, who spins around, nearly knocked over and then held upright by a nightmare of BIKE MESSENGERS."  PREMIUM RUSH-FINAL describes the scene as follows:  "Monday glances about, reacting to the sound of the approaching additional . . . messengers . . . .  Wilee glances . . . [to] the end of the street as the large group of messengers arrive and bike . . . .  Past Monday to Wilee as camera whip pans . . . to the swarm of riding messengers."  In both works, the protagonists are saved by the swarm.  The antagonists are defeated.

88.   The sequence in THE ULTIMATE RUSH ends with Ho and Chet racing each other down a hill in exultant celebration.  The sequence in PREMIUM RUSH-DRAFT ends: "Wilee stands up straight on his pedals, throws his head back and his arms out to the side in pure joy and freedom."  PREMIUM RUSH-FINAL ends with Wilee victoriously biking through the busy streets.

**Theme Similarities.**

89.     The theme of a novel, screenplay or film is its unifying or dominant perspective on a subject.  THE ULTIMATE RUSH and PREMIUM RUSH both include the following substantial, dominant theme similarities, among others.

90.     Both THE ULTIMATE RUSH and PREMIUM RUSH deal primarily with themes of status and wealth/power disparity, showing how low status, powerless protagonists can prevail physically, socially and morally over privileged, greedy and corrupt individuals and institutions.

91.     In both THE ULTIMATE RUSH and PREMIUM RUSH, the main protagonists are poor, young, yet highly-educated, messengers who become unlikely heroes by defeating wealthy, older, far more powerful and self-serving antagonists who seek to corrupt them.  In both THE ULTIMATE RUSH and PREMIUM RUSH, edgy prevails over conventional, cooperation prevails over divisiveness, righteous prevails over corrupt, anarchy prevails over entrenched, albeit, corrupt, structures and good prevails over evil.

92.     Both works advance the same message expressed in essentially identical themes.

**Setting Similarities.**

93.     The setting of a novel, screenplay or film is the time, place and circumstances in which the story takes place.  THE ULTIMATE RUSH and PREMIUM RUSH both include the following substantial, dominant similarities in settings, among others.

94.     Both THE ULTIMATE RUSH and PREMIUM RUSH are set "today" in key U.S. urban financial centers (San Francisco and New York).  In both THE ULTIMATE RUSH and PREMIUM RUSH, indoor action occurs primarily in the cramped, grungy messenger dispatch office, a downmarket bar (the "Padlock" in THE ULTIMATE RUSH "Jocko's Rocket Ship" in PREMIUM RUSH-DRAFT and "Joe's Bar" in PREMIUM RUSH-FINAL), the police precinct house and a Chinese "front" business.

95.     In both THE ULTIMATE RUSH and PREMIUM RUSH, the outdoor action occurs primarily in crowded central business district streets, which are gridlocked, damaged and dangerous.

**Pace Similarities.**

96.     The pace of a novel, screenplay or film is the rate of movement or performance of a scene or story.  THE ULTIMATE RUSH and PREMIUM RUSH both have the same pace.

97.     THE ULTIMATE RUSH was written to be adapted into an action movie, with constant motion and obstacle-laden chase scenes.  PREMIUM RUSH paces just like the Novel.

**Dialogue, Dialect And Vernacular Similarities.**

98.     The dialogue of a novel, screenplay or film is its conversational element (i.e., the back and forth communications, verbal and non-verbal, between characters).  Dialogue similarities also may encompass similarities in dialects, and the characteristic manner in which words are selected and used.  It is impossible in the context of a Complaint to address all of the dialogue similarities in THE ULTIMATE RUSH and PREMIUM RUSH.  The dialogue similarities in the works strongly suggest that the "writers" of PREMIUM RUSH had a copy of THE ULTIMATE RUSH (as well as a copy of the Healy and Hefter Screenplays, which were based on THE ULTIMATE RUSH) very close at hand at the time they adapted the Novel into the screenplay.

99.     Both works begin with a voice that challenges the protagonist on the possibly lethal level of risk in his occupation.  In THE ULTIMATE RUSH, a voice from the crowd says, "'Don't do it man.  You'll kill yourself.'"  In PREMIUM RUSH-DRAFT, a voice-over asks, "'Aren't you afraid of dying?'" and in PREMIUM RUSH-FINAL, Vanessa, Wilee's love interest, asks, ". . . you afraid of dying?"

100.    In each case, the protagonists' response is substantially similar.  In THE ULTIMATE RUSH, the protagonist concurs with the concern raised by the voice, then describes his physical/emotional response:  "He's right. . . .  Just the thought gives me a

1    hard-on.  I have to take deep breaths to hold down my Honey Nut Cheerios.  The diesel

2    engine in my chest is doing triple flips.  My quivering knees hug together to keep me from

3    wetting myself.  I love it."  In PREMIUM RUSH-DRAFT, the protagonist responds, "'Sure,

4    I'm afraid of dying.  But the rush I get when I slip out of something I got no right to

5    survive?  There's no feeling on earth like it. . . .  With the possible exception of looking at

6    you'" (i.e., the love interest).  In PREMIUM RUSH-FINAL, the protagonist responds, "You

7    wanna know what scares me [is] what happened to my friends who just got out of law

8    school . . . That is collective insanity."  Wilee and Vanessa subsequently kiss.

9        101.    A virtually identical "negotiation" dialogue then takes place between the

10   dispatchers and the protagonists in both works.  In THE ULTIMATE RUSH, Mel the

11   dispatcher offers Chet: "'If you make this delivery in eight minutes, I'll give you four

12   hundred dollars [the usual rate is $15].'"  Mel increases the offer to $500.  The dispatcher

13   tells the protagonist the address, and the protagonist accepts the delivery.  Chet is warned

14   that if he does not make the delivery on time he will be fired.  In PREMIUM RUSH-

15   DRAFT, the dispatcher offers to Wilee: "Gotta be deliver[ed] in ninety minutes. . . .  I give

16   you twenty extra."  The dispatcher tells Wilee the address, and Wilee accepts the delivery.

17   The dispatcher then warns Wilee by adding, "And don't screw up."  The same sequence

18   carries through to PREMIUM RUSH-FINAL, except the final amount paid to Wilee ends

19   up to be thirty dollars.  In THE ULTIMATE RUSH, the Hefter Screenplay and PREMIUM

20   RUSH-FINAL, the protagonist gets the delivery only after another messenger refuses the

21   assignment ("Spider" in THE ULTIMATE RUSH and the Hefter Screenplay, and "Polo" in

22   PREMIUM RUSH-FINAL).  In THE ULTIMATE RUSH the delivery instructions are

23   "Take this to Mission and Fifth.  The same place.  Dr. Chen."  In PREMIUM RUSH-

24   FINAL, the instructions are "Deliver only to Sister Chen.  It must be there by seven

25   o'clock."

26       102.    Both THE ULTIMATE RUSH and PREMIUM RUSH-FINAL contain the

27   same statement by the protagonist about the need to act decisively and not "hesitate" to

28   avoid danger in the protagonist's circumstances (THE ULTIMATE RUSH: "But my

1   hesitation will kill me"; PREMIUM RUSH-FINAL: "It's just the-the hesitation that'll kill

2   you.").

3       103.    The characters in THE ULTIMATE RUSH and PREMIUM RUSH swear in

4   largely the same unique way, further probative of copying.  In THE ULTIMATE RUSH,

5   the characters often fabricate new composite curse words, both from old curse-words and

6   from non-curse words, and create new, uncommon forms of a word (e.g., "'rollerfag,'"

7   "fuckupitude," "'douchebag'" and "Dickette Tracy").  The characters in PREMIUM RUSH-

8   DRAFT and PREMIUM RUSH-FINAL do the same thing – using the same words (e.g.,

9   "douchebag," "'dickishness'" and "'douche-nozzle'").

10      104.    Other obvious examples of dialogue similarity are set forth in Paragraphs 45,

11  47, 51, 66, 69, 71, 72, 76, 82, 83, 86 and 87 of this Complaint.  There are numerous

12  additional examples of copied dialogue between, on the one hand the Novel, the Healy

13  Screenplay/ Hefter Screenplay and, on the other hand, the drafts and final PREMIUM

14  RUSH.

15  **Mood Similarities.**

16      105.    The mood of a novel, screenplay or film is its predominant emotional tone or

17  general attitude.  Both THE ULTIMATE RUSH and PREMIUM RUSH have the same

18  mood.

19      106.    Both THE ULTIMATE RUSH and PREMIUM RUSH at the outset grab the

20  audience with a kinetic, edgy, daring mood then contrast that with the dark, secretive,

21  cunning mood of the high status manipulators.  Both plots are liberally interspersed with

22  urgent, suspenseful and dangerous chase scenes.  In both works, the interaction between the

23  protagonists and their love interests (Ho and Vanessa) adds romance, camaraderie and

24  comical/sexual energy to the story and allows the audience a break from the suspenseful

25  scenes.

26      107.    The kinetic mood is captured in both THE ULTIMATE RUSH and

27  PREMIUM RUSH with a "no brakes" metaphor.  In THE ULTMATE RUSH, the

28  protagonist states, "I work with the type of psychopaths who cut their own brake cables.

1   They hurdle through the crowded streets, screaming, 'No brakes! No brakes!'"  The Hefter

2   Screenplay opens in a scene in which Chet survives a jump – "never applying brakes."

3   PREMIUM RUSH-FINAL opens with the protagonist stating "[N]o brakes . . . .  Can't

4   stop," and his love interest, Vanessa, later saying "No, I ride, but not like you, Wilee.  I put

5   a brake on my bike and I use it."

6       108.    There is essentially no difference between the mood of the works, or in the

7   progression of moods, as the story moves forward from its physical beginning to its moral

8   conclusion.

9   **Similarities In The Use Of Music.**

10      109.    A work may be similar to another work in its use of music or sound elements.

11  Both THE ULTIMATE RUSH and PREMIUM RUSH use the same kind of music, for the

12  same creative purpose.

13      110.    THE ULTIMATE RUSH relies on music to express the protagonists' intense

14  mood and attitude throughout the Novel.  PREMIUM RUSH-DRAFT incorporates the use

15  of music in the same way, and includes no original music suggestions.  Rather, PREMIUM

16  RUSH-DRAFT simply adopts the music in THE ULTIMATE RUSH, even using the same

17  words to describe it.  In THE ULTIMATE RUSH: "The music is inside me.  Bass drums are

18  thudding in my rib cage, electric guitars shredding blood from my eardrums, bass guitars

19  cracking my skull with each pluck"; "a driving thunderous beat that is surprisingly macho";

20  "Her name here is 'that cool chick on bass. . . .'  Ho thumps that thing . . . ."  In PREMIUM

21  RUSH-DRAFT: "Loud, THUMPING music rises up"; and "The only sound is a low,

22  THROBBING BASS, must be coming from somebody's open window, a stereo turned up

23  loud"; and "The THUMPING MUSIC we heard from the car window was coming from

24  here.  The Dreadlocked Messenger stands on the bar with a microphone"; and "He's

25  dragged away by the crowd to get his bike, the THUMPING BASS resumes . . . ."  Because

26  PREMIUM RUSH-FINAL was not a draft created for the purpose of putting music to the

27  Film (it appears to have been used by the "shooting" artists and crew), it does not disclose

28  any music instructions and therefore does not add any new information.

**Other Non-Coincidental Similarities And Atypically Common Patterns In The Works That Are Further Evidence Of Copying.**

111.   **Title.**   The title PREMIUM RUSH is extremely similar to THE ULTIMATE RUSH.  The word "ultimate" means "the best or most extreme of its kind."  The word "premium" means "of exceptional quality or amount."  The words are nearly synonyms in the English language.

112.   **Joke About Colombian Drug Trade.**   Both works mention "Colombia/Columbia" in reference to illegal activity.  In THE ULTIMATE RUSH, Chet asks, "What is this?  Colombia?  Where the hell is a cop when you need one?"  In PREMIUM RUSH-DRAFT, Raj proclaims, "'Is not drugs!  Can't be drugs, is from Columbia'" (this is supposed to be a joke that equates drugs from Columbia University with the Republic of Colombia).  In PREMIUM RUSH-FINAL, Raj declares, "It's not drugs. It can't be drugs.  It's from a highly respected East Coast College.'"

113.   **Odd Word "Aggro."**   Both works use the word "aggro," a rare slang term that means aggravation or aggression.  In THE ULTIMATE RUSH, Chet says "We both take the cement steps on one simultaneous leap, hit the 'vard, and totally aggro.'"  In PREMIUM RUSH-DRAFT, WILEE says, "'Not my problem.  I don't need the aggro." The word "aggro" is highly peculiar and, in combination with the other similarities, is probative of copying.  Although this joke was dropped from PREMIUM RUSH-FINAL, its inclusion in PREMIUM RUSH-DRAFT is probative of access, direct copying and willful infringement.

114.   **Watermelon.**   The opening scene in THE ULTIMATE RUSH occurs at a fictitiously-named "Watermelon Hill" in San Francisco.  During the corresponding scene in PREMIUM RUSH-DRAFT, quite inexplicably, the protagonist's action is described as follows:  "He squirts out between the cab and truck like a watermelon seed, the truck horn BLARES as the cab tries unsuccessfully to cut it off."  If the other similarities did not exist, it would be easy to disregard this as a trivial coincidence.  Given the other similarities, indeed, the copying, it is reasonable to infer that the "watermelon" on the mind of the

1  screenwriters was Watermelon Hill.  Although this reference was dropped from PREMIUM

2  RUSH-FINAL, its inclusion in PREMIUM RUSH-DRAFT is probative of access, direct

3  copying willful infringement.

4       115.  **"Bobby" The Addict.**  In THE ULTIMATE RUSH, a flashback scene shows

5  the reader "Bobby," Chet's crack addict brother.  In PREMIUM RUSH-DRAFT and

6  PREMIUM RUSH-FINAL, in a flashback scene we are introduced to "Bobby," a gambling

7  addict cop.  Again, given the other similarities between the works, it is reasonable to infer

8  that the addicted Bobby in PREMIUM RUSH was derived from addicted brother "Bobby"

9  in THE ULTIMATE RUSH.

10      116.  **"Goons."**  Both works use the word "goon" to describe the gangsters.  In

11 THE ULTIMATE RUSH, Chet states, "In my day, we would have hit up those well-dressed

12 goons for some firecracker money before we gave them any information."  In PREMIUM

13 RUSH-DRAFT, the screenplay describes: "Monday looks up.  An ENORMOUS ASIAN

14 GOON stands over him, holding a copy of the Yellow pages.  A SECOND GOON stands

15 behind him, as backup.  The Goon swings the phone book one more time . . ."  The term

16 "goon" was dropped from PREMIUM RUSH-FINAL, but the description of an

17 "ENORMOUS ASIAN MAN" is consistent with THE ULTIMATE RUSH's use of

18 "goons," and the Healy and Hefter Screenplays' use of a huge (5 foot 6 inch, 350 pound or

19 6 foot 5 inch, 300 pound) "Asian man" named "Mr. Chang."  The use of the word "goon" in

20 PREMIUM RUSH-DRAFT is probative of access, direct copying and willful infringement.

21      117.  **Debbie/Debra.**  In THE ULTIMATE RUSH, the protagonist's ex-girlfriend

22 is named "Debbie."  In PREMIUM RUSH-DRAFT and PREMIUM RUSH-FINAL,

23 "Debra" is the name of the woman who works at Columbia law school.  In PREMIUM

24 RUSH-DRAFT, Debra has feelings for Wilee: "'Wilee, my own man.'  Wilee turns.

25 Debra's face brightens when she sees him – she likes him."  Although the character Debra

26 appears in PREMIUM RUSH-FINAL, the romantic interest is not as clear.  However,  its

27 inclusion in PREMIUM RUSH-DRAFT is probative of access, direct copying and willful

28 infringement.

118.   **Snakebyte/Snakehead.**   In THE ULTIMATE RUSH, the protagonist has a secret hacker name –  "Snakebyte."  In PREMIUM RUSH-FINAL, Wilee is required to deliver a package to Sister Chen – whose secret code name is "snakehead."

119.   **Children Assisting Pursuers.**  In both THE ULTIMATE RUSH and PREMIUM RUSH, when the protagonists are being chased, the pursuers are aided by children who point the pursuers in the direction in which the protagonists have fled (described as "young citizens" in THE ULTIMATE RUSH and "schoolchildren" in PREMIUM RUSH).

120.   **Main Characters Hide Cash.**  In THE ULTIMATE RUSH, Chet hides his "cash under the sand of [his] snake cage.'"  In the Hefter Screenplay and PREMIUM RUSH, a main character hides cash under a bed (Chet in the Hefter Screenplay and Nima in PREMIUM RUSH).

121.   **Reference To "Drafting".**  In both THE ULTIMATE RUSH and PREMIUM RUSH, the protagonist and his competitive messenger discuss "drafting" another person to save energy, both arbitrarily mentioning the adversarial relationship with law enforcement in the same discussion.  In THE ULTIMATE RUSH, Chet teaches Spider terminology and states, "So if you don't like chopping up the hill, but a five-oh [policeman] is scoping, you can actually draft along behind a bus or something?"  In PREMIUM RUSH-FINAL, Wilee says to Manny "I'm in your draft, dude!  It's like you're on my team!"  The camera instruction then states "CAMERA TRACKS  . . . BEHIND WILEE AS HE SPEEDS PAST SOME POLICE OFFICERS, WHO GESTURE AND REACT."

**Further Allegations Regarding Access To "The Ultimate Rush" And The Healy And Hefter Screenplays.**

122.   The Healy and Hefter Screenplays were authorized draft screenplays based upon THE ULTIMATE RUSH under an option that has expired.  No lawful use could be made of the Healy or Hefter Screenplays without plaintiff's approval.  The defendants copied and used the Healy and Hefter Screenplays, without plaintiff's approval, when the Screenplay and Film PREMIUM RUSH were written and produced.  The Healy and Hefter

1   Screenplays included, among other things, copyright-protected elements of THE

2   ULTIMATE RUSH, including but not limited to, the elements described in this Complaint.

3          123.    After being provided the earliest drafts of the PREMIUM RUSH screenplay

4   in discovery, plaintiff has identified to-date more than 450 similarities among THE

5   ULTIMATE RUSH-based works (the Novel, the Healy Screenplay and the Hefter

6   Screenplay) and PREMIUM RUSH.  All of these similarities are too numerous to identify

7   in full in this complaint, but they will be provided in discovery.  By way of example, the

8   following segments of the Hefter Screenplay (a number of which were based upon similar

9   segments of the Healy Screenplay) and the Healy Screenplay are so similar to PREMIUM

10  RUSH in substance and sequence, that it is impossible for PREMIUM RUSH to have been

11  "written" without the "writers" having the Hefter and/or Healy Screenplays (depending on

12  the segment) next to them at their desks.

13  **Opening Shot (Hefter Screenplay p. 1/PREMIUM RUSH-DRAFT p. 1/PREMIUM**

14  **RUSH-FINAL Reel 1AB, p.1).**

15         124.    The Hefter Screenplay opens with a shot of Chet, a courier, flying over the

16  camera: "A rollerblader, CHET, courier bag strapped to his back, gets huge air as he comes

17  over the hill.  He flies OVER the CAMERA, FREEZING as a flailing silhouette against the

18  sun."  PREMIUM RUSH-DRAFT opens: "EXT   MANHATTAN   DAY  The skyline, seen

19  from a lowish angle.  A body tumbles through the air, slow-motion, right over our heads."

20  PREMIUM RUSH-FINAL opens: "SCENE 3 – EXT MANHATTAN SKYLINE – DAY –

21  LS – LOW ANGLE – VARIABLE SPEED SEQUENCE – SEVERAL BUILDINGS.

22  WILEE, A BIKE MESSENGER, ENTERS L. AND SOARS R. THROUGH FRAME IN

23  SLOW MOTION." "SCENE 3" is the first scene after the opening titles (i.e. the opening

24  scene).

25         125.    PREMIUM RUSH-FINAL also copies the Hefter Screenplay's use of a

26  protagonist's voice over in the opening scene, adapted in form and substance from THE

27  ULTIMATE RUSH.  In the voice over, the protagonist talks about the risk of death,

28  identifies the city where he works, talks about how regular people do not understand

1    messengers and identifies how little they are paid by citing a specific dollar amount

2    ("fifteen bucks a pop" in THE ULTIMATE RUSH and "eighty bucks on a good day" in

3    PREMIUM RUSH –FINAL).

4    **Roommate Conflict Scene (Hefter Screenplay p. 23/PREMIUM RUSH-FINAL Reel**

5    **1AB, p. 29).**

6          126.    THE ULTIMATE RUSH, the Hefter Screenplay and PREMIUM RUSH-

7    FINAL include a roommate conflict scene.  In THE ULTIMATE RUSH and the Hefter

8    Screenplay, Chet picks up a delivery envelope, and we are introduced to Ho, Chet's love

9    interest.  Ho reveals that she is currently dealing with roommate troubles, and that her ex-

10   roommate just moved out.  When Chet asks why Ho hadn't told him earlier, Ho responds, "I

11   just wanted to deal with it on my own for a while!"  In PREMIUM RUSH-FINAL, Chet

12   picks up a delivery envelope and it is revealed that Vanessa, Wilee's love interest, is

13   currently dealing with roommate troubles, and that Vanessa's ex-roommate just moved out.

14   When Wilee asks for more information, Vanessa responds: "I don't want to talk about it."

15   The revelation of roommate troubles occurs at the same point in both screenplays.

16   **Bathroom Scene (Healy Screenplay p. 48/Hefter Screenplay p. 34/PREMIUM RUSH-**

17   **FINAL Reel 2AB, pp. 44-45).**

18         127.    The Hefter Screenplay and PREMIUM RUSH-FINAL include a plot point

19   that occurs in a bathroom.  In the Hefter Screenplay, while in the bathroom, Spider sees

20   Chet's courier bag wide open on the floor and steals the delivery package.  In PREMIUM

21   RUSH-FINAL, while hiding in the bathroom of a police station and immediately after

22   discovering that the police are complicit, Wilee opens the delivery package and discovers

23   its contents and hides from his primary law enforcement antagonist (Bobby Monday) and

24   two detectives.  In the Healy Screenplay, after discovering at the police station that the

25   police are complicit, Chet asks where the bathroom is as a ruse to escape his primary law

26   enforcement antagonist (Gina Corlini) and two detectives.  In both THE ULTIMATE

27   RUSH and PREMIUM RUSH-FINAL, the protagonist's motivation to open the envelope is

28   both curiosity and fear.

**Meeting The Love Interest (Hefter Screenplay p. 21/PREMIUM RUSH-FINAL Reel 4AB, p. 49).**

128.    In both the Hefter Screenplay and PREMIUM RUSH-FINAL, we meet the protagonist's female love interest at a grunge bar, where a band is finishing its last song on stage.  In the Hefter Screenplay we meet Ho at night "INT. PADLOCK – 20 MINUTES LATER"  On stage: The band 'Nipple Residoo' (emblazoned on re bass drum) rips through the final song of their set."  In PREMIUM RUSH-FINAL, we meet Vanessa "INT. JOE'S BAR – FLASHBACK – NIGHT – MCS – PAST WILEE, SEATED AT THE . . . BAR. . .VANESSA, SEATED NEXT TO HIM AND FACING HIM. . .THE. . .BAND FINISHES A SONG.  SHE TURNS. . .TOWARD THE . . . STAGE."

**Main Character Pinned By The Throat (Hefter Screenplay p. 38/PREMIUM RUSH-FINAL Reel 3AB, p. 32).**

129.    In both the Hefter Screenplay and PREMIUM RUSH, an antagonist grabs a main character with one arm and pins the character's throat (Chet in THE ULTIMATE RUSH and the Hefter Screenplay, and Nima in PREMIUM RUSH-DRAFT and PREMIUM RUSH-FINAL).

**Major Chase Scene (Hefter Screenplay pp. 61-62/PREMIUM RUSH-DRAFT pp. 20-22 /PREMIUM RUSH-FINAL Reel 1AB p. 40 - Reel 2AB, p. 5).**

130.    In one of the PREMIUM RUSH chase scenes, there are 13 separate instances in which the action, and in numerous cases, specific words, mirror those used in the Hefter Screenplay.  These 13 similarities occur in a mere three pages of the PREMIUM RUSH-DRAFT, leading to the reasonable inference that defendants derived their work directly from the Hefter Screenplay (which itself was based directly on THE ULTIMATE RUSH).

131.    The following are the 13 similarities, also showing the sequence in which they appear:

**HEFTER SCREENPLAY (Seq=1)**:  "Deegan's MOTORCYCLE ROARS to life";

**PREMIUM RUSH-DRAFT (Seq=1)**:  "a late model four door sedan, ROARS into view alongside him."

**PREMIUM RUSH-FINAL (Seq=1)**:  "past Wilee, riding . . . to Monday's car, SPEEDING . . . behind him . . . ."

**HEFTER SCREENPLAY (Seq=2)**:  "EXT. BUSY INTERSECTION – DAY";

**PREMIUM RUSH-DRAFT (Seq=2)**:  "blasting into the intersection . . . . Wilee sees worsening conditions ahead. The intersection is jammed."

**PREMIUM RUSH-FINAL (Seq=2)**:  "past stopped cars to Wilee, cycling . . . through the intersection . . .Wilee riding . . . through cross-traffic . . . ."

**HEFTER SCREENPLAY (Seq=3)**:  "Chet jumps the concrete divider and blades for all he's worth";

**PREMIUM RUSH-DRAFT (Seq=3)**:  "Wilee cuts into the middle of the boulevard, where a set of elevated train tracks separates the north and southbound lanes."

**PREMIUM RUSH-FINAL (Seq=3)**:  "Monday's car, swerving . . . to reveal Wilee, cycling . . . below elevated train tracks . . . ."

1    **HEFTER SCREENPLAY (Seq=4):**  "Chet grabs onto the back of a passing

2    1978 VW Bug";

3    **PREMIUM RUSH-DRAFT (Seq=9):**  "[Wilee] catches up to a cab,

4    grabbing hold of the door handle and letting the car do the work."

5    **PREMIUM RUSH-FINAL (Seq=7):**  "Ext. Broadway – Day – . . . taxis and

6    other cars, driving . . . .  Camera pans . . . to Wilee, cycling  . . . .  He cuts . . .

7    alongside a taxi."

8

9    **HEFTER SCREENPLAY (Seq=5)**:  "Chet rides the Bug to the top of the

10   hill";

11   **PREMIUM RUSH-DRAFT (Seq=4)**:  "Wilee's pedaling hard, but there's a

12   slight uphill"

13   **PREMIUM RUSH-FINAL**:  Omitted (PREMIUM RUSH is set in New

14   York, which lacks hills – which the "writer" of PREMIUM RUSH-DRAFT

15   missed).

16

17   **HEFTER SCREENPLAY (Seq=6):**  "He shakes his burned fingers, looks

18   over his shoulder, sees . . . Deegan";

19   **PREMIUM RUSH-DRAFT (Seq=5):**  "He looks back over his shoulder and

20   sees the front grill again [of Monday's car]."

21   **PREMIUM RUSH-FINAL (Seq=6):**  "Ext. Monday's Car – Day . . .

22   Monday, reacting and glancing . . . over his shoulder."

23

24

25

26

27

28

1    **HEFTER SCREENPLAY (Seq=7):** "Chet starts to roll downhill,

2    backwards";

3    **PREMIUM RUSH-DRAFT (Seq=7):** "Wilee's humping it down Broadway

4    fast, on a downhill."

5    **PREMIUM RUSH-FINAL (Seq=9):** "Ext. Broadway – Day . . . past

6    Monday's car to Wilee, Riding . . ."

7

8    **HEFTER SCREENPLAY (Seq=8)**: "Chet spins and shoots down the hill

9    with reckless abandon¸ weaving around potholes, displaying confidence born

10   of proven ability.";

11   **PREMIUM RUSH-DRAFT (Seq=12)**: "As cars HONK, he [Wilee] snakes

12   his way down, supremely confident."

13   **PREMIUM RUSH-FINAL (Seq=8):** "Wilee, riding . . . . Oncoming cars

14   swerve to avoid him . . . Irate Taxi Driver . . . moron!"

15

16   **HEFTER SCREENPLAY (Seq=9)**: "Deegan crests the hill full throttle,

17   gets air and plunges down the slope after Chet.";

18   **PREMIUM RUSH-DRAFT (Seq=8)**: "Over the rise comes the ROAR of

19   an engine and Monday's car reappears."

20   **PREMIUM RUSH-FINAL**: Omitted (PREMIUM RUSH is set in New

21   York, which the "writer" of PREMIUM RUSH-DRAFT forgot lacks hills).

22

23   **HEFTER SCREENPLAY (Seq=10)**: "He goes into an impossibly low

24   crouch and shoots right under the truck";

25   **PREMIUM RUSH-DRAFT (Seq=6)**: "But there's more to his plan than

26   just cutting under the train tracks."

27   **PREMIUM RUSH-FINAL**: Moved to the chase described in sequence 3

28   above.

1        **HEFTER SCREENPLAY (Seq=11)**: "[B]arely scraping the top of his

2        helmet on the truck's underbelly";

3        **PREMIUM RUSH-DRAFT (Seq=10)**: "PEDESTRIANS SCREAM . . . but

4        he serpentines right through them, practically rubbing shoulders"

5        **PREMIUM RUSH-FINAL (Seq=4)**: "Past Wilee . . . riding . . . through a

6        narrow opening in the concrete roadblocks . . . ."

7

8        **HEFTER SCREENPLAY (Seq=12)**: "A BLARING HORN captures

9        Chet's attention.  He turns and sees a set of headlights coming right at him.";

10        **PREMIUM RUSH-DRAFT (Seq=11)**: "and he cuts into the *uptown* lane,

11        headed the wrong way.  As cars HONK."

12        **PREMIUM RUSH-FINAL (Seq=12)**: "Ext. 95th Street . . . Wilee,

13        cycling . . . against oncoming traffic . . . ."

14

15        **HEFTER SCREENPLAY (Seq=13)**: "Chet takes the only option available.

16        He jumps the curb";

17        **PREMIUM RUSH-DRAFT (Seq=13)**: "Wilee sees worsening conditions

18        ahead.  The intersection is jammed.  He cuts left toward the side street[.]

19        POPS ROCK ONTO THE SIDEWALK"

20        **PREMIUM RUSH-FINAL**: Omitted.

21

22   **Protagonist/Competitor Struggle For Delivery Package (Hefter Screenplay pp. 34-**

23   **48/PREMIUM RUSH-DRAFT pp. 68-77/PREMIUM RUSH-FINAL Reel 4AB, p. 10-**

24   **Reel 4AB, p. 11).**

25        132.    At one point in both the Hefter Screenplay and the PREMIUM RUSH

26   Screenplay, the competitor bike messengers (Spider/Manny) take the delivery package from

27   the protagonists (Chet/Wilee).  The protagonists demand that the delivery package be

28

1   returned but the competitor bike messengers taunt the protagonists and refuse to return the

2   delivery packages.

3          133.   The sequences and conversation in the foregoing scene are essentially

4   identical:

5                  **HEFTER SCREENPLAY:**  "Spider smiles.  Silently, he reaches down and

6                  unfastens the clips on Chet's bag, then reaches inside [taking the delivery

7                  envelope]."

8                  **PREMIUM RUSH-DRAFT:**  "Behind them, the Black-Clad Messenger

9                  leaves the office and heads off in the opposite direction, a battered envelope

10                 at one hand."

11                 **PREMIUM RUSH-FINAL:**  Omitted.

12

13                 **HEFTER SCREENPLAY (Seq=1):**  "CHET: 'Don't be an assh - - Look,

14                 Spider, I need that package back.'"

15                 **PREMIUM RUSH-DRAFT (Seq=1):**  "WILEE: 'I need that envelope you

16                 just picked up.'"

17                 **PREMIUM RUSH-FINAL (Seq=1):**  "WILEE: Need that envelope you just

18                 got."

19

20                 **HEFTER SCREENPLAY (Seq=2):**  "SPIDER: 'Package?  I don't know

21                 what you're talking about.'"

22                 **PREMIUM RUSH-DRAFT (Seq=2):**  "MANNY: 'Blow me.'"

23                 **PREMIUM RUSH-FINAL (Seq=2):**  "MANNY: Oh, do you really?"

24

25

26

27

28

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

**HEFTER SCREENPLAY (Seq=3):** "CHET: 'This isn't a joke!!!'"

**PREMIUM RUSH-DRAFT (Seq=3):** "WILEE: 'This is serious shit, Manny!'"

**PREMIUM RUSH-FINAL (Seq=3):** "WILEE: Yeah, seriously. You don't know what it is . . . Pull over and give it to me, man! I'll explain later."

**HEFTER SCREENPLAY (Seq=4):** "SPIDER: 'Chester, read my lips, I-did-not take-your-package. Bye now.'"

**PREMIUM RUSH-DRAFT (Seq=4):** "MANNY: Byyyyeeee! Manny reaches for the disconnect button on his Bluetooth . . ."

**PREMIUM RUSH-FINAL (Seq=4):** "He reaches up to his ear and hangs up."

**Protagonist/Antagonist Struggle For Delivery Package (Hefter Screenplay pp. 60-82/PREMIUM RUSH-DRAFT pp. 85-86/PREMIUM RUSH-FINAL Reel 4AB, p. 35 - Reel 4AB, p. 44).**

134.    At one point in both the Hefter Screenplay and the PREMIUM RUSH screenplay, a chase scene starts when a courier's bag is grabbed by the protagonist (the bag was Spider's in THE ULTIMATE RUSH and Manny's dropped courier bag in PREMIUM RUSH) and ends in a narrow, dead-end alley with an extremely similar setting, narrative of events and resolution.

135.    The sequences and conversation in the foregoing scene are essentially identical:

**HEFTER SCREENPLAY (Seq=1):**  "In one motion, Chet severs the strap on Spider's bag and snatches it.  Cradling the bag to his chest, he's gone as quickly as he arrived."

**PREMIUM RUSH-DRAFT (Seq=5):**  "Monday lunges, reaching out one desperate hand, he gets hold of the strap to Wilee's messenger bag - - and it TEARS!"

**PREMIUM RUSH-FINAL (Seq=5):**  "Monday lunges . . . and grabs the messenger bag attached to Wilee's back."


**HEFTER SCREENPLAY (Seq=2):**  Chet takes the bag, which he learns upon opening it does not contain the relevant delivery material.

**PREMIUM RUSH-DRAFT (Seq=6):**  Monday takes the bag, which he learns upon opening it does not contain the relevant delivery material.

**PREMIUM RUSH-FINAL (Seq=6):**  "Wilee unbuckles the bag strap . . . to reveal Monday, staggering . . . with the bag."


**HEFTER SCREENPLAY (Seq=3):**  "EXT. NARROW ALLEY – SAME TIME.  The alley is a dead end."

**PREMIUM RUSH-DRAFT (Seq=1)**:  "So Wilee cuts sharply left, into a narrow alley.  EXT ALLEY DAY."

**PREMIUM RUSH-FINAL (Seq=3):**  "Wilee rides . . . down an alleyway. Vanessa follows . . . .and [they] come to a stop before a dead end."

1    **HEFTER SCREENPLAY (Seq=4):** "Ho: 'This was a good choice.'"

2    **PREMIUM RUSH-DRAFT (Seq=2):** "And you know, this is the first bad

3    decision Wilee's made all day . . . because the alley is a dead-end."

4    **PREMIUM RUSH-FINAL:** Part of sequence 3.

5

6    **HEFTER SCREENPLAY (Seq=5):** "CHET: 'The doors.' They try every

7    door on both sides of the alley – locked! . . . Chet and Ho reach the dead-end

8    brick wall."

9    **PREMIUM RUSH-DRAFT (Seq=3):** "He gets to the solid wall at the far

10   end, sees the heavily barred doors on both sides. Spins to a stop."

11   **PREMIUM RUSH-FINAL:** Part of sequence 3.

12

13   **HEFTER SCREENPLAY (Seq=6):** [Chet makes his way to the open end

14   of the alley]: "He sails twenty feet, landing with a CLATTER on the dry

15   asphalt beyond."

16   **PREMIUM RUSH-DRAFT (Seq=4):** "He runs to the mouth of the alley,

17   which is twenty feet away, then ten, then five - - then WILEE BURSTS OUT

18   OF IT, PEDALING AS HARD AS HE CAN - -."

19   **PREMIUM RUSH-FINAL (Seq=4):** "police starts to get out of the car as

20   Vanessa and Wilee suddenly speed . . . out of the alley way."

21

22   **HEFTER SCREENPLAY (Seq=7):** "Chet turns. Sees a delivery truck

23   passing through the intersection directly in front of him."

24   **PREMIUM RUSH-DRAFT (Seq=7):** "Thinks for a minute, clutching

25   Manny's messenger bag . . . he hears a HIGH PITCHED BEEPING sound,

26   he turns -- sees a delivery truck backing up in front of him . . . ."

27   **PREMIUM RUSH-FINAL (Seq=1)** "Monday gazes . . . at some workers,

28   guiding a large truck as it reverses, blocking the street."

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

1    **HEFTER SCREENPLAY (Seq=8):** "[Chet] loses control, falls headfirst,

2    and slides under the truck."

3    **PREMIUM RUSH-DRAFT (Seq=8):** "[Wilee] swerves hard to the right,

4    cuts neatly around the truck."

5    **PREMIUM RUSH-FINAL (Seq=2):** "Wilee . . . holds on to the handle bars

6    of his speeding bike as he slides his feet, traveling alongside it under the

7    truck."

8

9    136.    At the same point in this chase, in both the Hefter Screenplay and PREMIUM

10   RUSH-FINAL, a character in the scene takes the time to stop and give his pursuer the

11   "middle finger."  In the Hefter Screenplay "Deegan pulls alongside the fence . . . Chet

12   extends a hearty middle finger to him."  In PREMIUM RUSH-FINAL, "WILEE CHASES

13   FROM BG. MANNY REACHES . . . AND HOLD HIS MIDDLE FINGER UP."  While

14   "the middle finger" is common in contemporary movies, the coincidental use of the gesture

15   in the same place in the same scene (vs. elsewhere in the movie) is implausible and is a

16   further sign of copying.

17   **"Under The Truck" Scene (Healy Screenplay p. 81/Hefter Screenplay p.**

18   **62/PREMIUM RUSH-FINAL Reel 4AB, p. 36).**

19   137.    In both the Hefter Screenplay and PREMIUM RUSH-FINAL, a high-speed

20   chase scene involves the protagonist sliding under a large truck.  In the Healy Screenplay,

21   the protagonist is forced to slide under an "eighteen wheeler."

22   **A Bike Competition Nuance (Healy Screenplay p. 3/Hefter Screenplay p.**

23   **113/PREMIUM RUSH-FINAL Reel 4AB, pp. 52-53).**

24   138.    In both the Hefter Screenplay and the PREMIUM RUSH-FINAL screenplay,

25   a messenger wins a bike race.  In the Hefter Screenplay the winner is Chet's friend, Trey –

26   who has dreadlocks that flow from his helmet.  In PREMIUM RUSH-FINAL, Wilee is the

27   winner – and the award is presented by a character who is, not arguably coincidentally,

28   named "DREAD."  In the Healy Screenplay, the protagonist is on the couch watching

1   rollerbladers compete in the X-Games and talking about "competing in the Superbowl of
2   inline skaters."

3   **Use Of A Tow Truck In The Final Chase Scene (Hefter Screenplay p. 105/PREMIUM**
4   **RUSH-FINAL Reel 5AB, p. 4).**

5        139.    In both the Hefter Screenplay and PREMIUM RUSH-FINAL, a tow truck is
6   used in the final chase scene for the protagonists to make a clever maneuver.  In the Hefter
7   Screenplay, as Ho and Chet escape they get into an accident and Chet hides behind a tow
8   truck.  In PREMIUM RUSH-FINAL, Vanessa rides into the scene hanging from a tow
9   truck.

10  **Some Scenes Found In The Healy Screenplay – But Not In The Hefter Screenplay.**

11       140.    It appears that the bulk of the direct copying came from the Novel and the
12  Hefter Screenplay.  The following segments of the Healy Screenplay track closely to scenes
13  in an early draft of the PREMIUM RUSH screenplay, dated September 10, 2009, but are
14  not found in the Hefter Screenplay.  The first example occurred in the first six pages of both
15  the Healy Screenplay (pp. 104-109) and an early draft of PREMIUM RUSH (pp. 93-99), in
16  the same part of the story.  The striking similarities strongly suggest that the writers of
17  PREMIUM RUSH possessed both the Healy and Hefter Screenplays at an early stage of
18  writing PREMIUM RUSH.

19  **Protagonists' Trade With Antagonists Is Followed By The Arrival Of The Police**
20  **(Healy Screenplay pp. 104-109/PREMIUM RUSH-DRAFT (9/10/09) pp. 93-99).**

21       141.    At the climax of both the Healy Screenplay and an early draft of the
22  PREMIUM RUSH screenplay, the protagonists meet with the antagonists in a warehouse to
23  make an exchange.  In the Healy Screenplay, Chet agrees to deliver a key to the safe-deposit
24  box containing incriminating evidence of the antagonists' scheme, in exchange for Ho, who
25  the antagonists have kidnapped.  In the early draft of the PREMIUM RUSH screenplay,
26  Wilee agrees to deliver a package containing incriminating evidence of the antagonists'
27  scheme, in exchange for his bicycle, which the antagonists have stolen.  In both screenplays,
28  the police arrive at the warehouse right after the exchange and chase the protagonists.

142.   The sequences and conversation in the foregoing scene are essentially identical:

> **HEALY SCREENPLAY (Seq=1):** "CHANG'S WAREHOUSE –
> MOMENTS LATER"
> **PREMIUM RUSH-DRAFT (Seq=4):** "EXT IMPOUND YARD . . . a
> hulking, rusty warehouse two blocks long."
>
> **HEALY SCREENPLAY (Seq=2):** [Chet writes a note to the antagonists.]
> "*Start Ho walking across the lot, and the next rocket will send you the safe-
> deposit key."*
> **PREMIUM RUSH-DRAFT (Seq=1):** "WILEE: 'But I want my bike first . .
> . Get me my bike and I'll get you the ticket.'"
> **PREMIUM RUSH-DRAFT (Seq=7):** "WILEE: 'But I want my bike first."
>
> **HEALY SCREENPLAY (Seq=3):** "Chang ponders it, then turns to Spock."
> **PREMIUM RUSH-DRAFT (Seq=2):** "Monday looks at him, thinking.
> Finally nods."
> **PREMIUM RUSH-DRAFT (Seq=8):** "Monday turns to a passing
> UNIFORM."
>
> **HEALY SCREENPLAY (Seq=4):** "CHANG: 'Bring her here.'"
> **PREMIUM RUSH-DRAFT (Seq=3):** "WILEE: 'Bring me Manny.'"
> **PREMIUM RUSH-DRAFT (Seq=9):** "MONDAY: ". . . But bring him
> back."

1   **HEALY SCREENPLAY (Seq=5):** "Spock walks farther into the

2   warehouse, where one of Chang's Lincolns is parked."

3   **PREMIUM RUSH-DRAFT (Seq=10):** "Wilee heads into the warehouse

4   with the Uniform as the squad car carrying Manny comes to a stop."

5

6   **HEALY SCREENPLAY (Seq=6):** "Spock opens the rear door. Ho steps

7   out."

8   **PREMIUM RUSH-DRAFT (Seq=6):** "[Monday] comes around to the rear

9   passenger door and opens it to let Wilee out."

10

11   **HEALY SCREENPLAY (Seq=7):** "Spock leads her over to Chang . . ."

12   **PREMIUM RUSH-DRAFT (Seq=11):** "The Uniform leads Wilee to a

13   section on the far side . . ."

14

15   **HEALY SCREENPLAY (Seq=8):** "[Chet] watches with a mixture of relief

16   and anxiety as Ho emerges from the warehouse and starts across the open

17   area."

18   **PREMIUM RUSH-DRAFT (Seq=14):** "IN THE WAREHOUSE . . .

19   [Wilee's] eyes light up - - he finds his bike."

20

21   **HEALY SCREENPLAY (Seq=9):** "[Ho] starts across the open area."

22   **PREMIUM RUSH-DRAFT (Seq=12):** "[Wilee] starts down the aisle."

23

24   **HEALY SCREENPLAY (Seq=10):** "[LEVY is] standing near his car,

25   trying to make sense of why Ho is there . . ."

26   **PREMIUM RUSH-DRAFT (Seq=13):** ". . . Manny [is] led out the back of

27   the squad car . . . Manny shrugs, doesn't know what Monday's talking

28   about."

1    **HEALY SCREENPLAY (Seq=11):** "INT. CHANG'S WAREHOUSE –
2    SAME"
3    **PREMIUM RUSH-DRAFT (Seq=15):** "INT IMPOUND WAREHOUSE
4    DUSK"
5
6    **HEALY SCREENPLAY (Seq=12):** "Chang sees Wily dart into the open.
7    He then sees Chet . . . CHANG: 'There he is!'"
8    **PREMIUM RUSH-DRAFT (Seq=16):** "we see Monday turn sharply, away
9    from Manny, and YELL into the warehouse . . . MONDAY: 'HEY!'"
10
11   **HEALY SCREENPLAY (Seq=13):** "Ho hears Wily's BARK and turns to
12   him. The movement saves her life because a nanosecond later . . . - - a
13   GUNSHOT takes out a TUFT of Ho's blue hair."
14   **PREMIUM RUSH-DRAFT (Seq=17):** "Wilee doesn't even turn . . . but
15   now he's got his *bike* back . . . he lays both hands on it, pulls it out of the rack
16   - -   - - and almost dies. *It's been crushed.*"
17
18   **HEALY SCREENPLAY (Seq=14):** "Chet LEAPS into the abyss."
19   **PREMIUM RUSH-DRAFT (Seq=19):** "Monday leaps to his feet . . ."
20
21   **HEALY SCREENPLAY (Seq=15):** "TWO POLICEMEN scramble out of
22   their car."
23   **PREMIUM RUSH-DRAFT (Seq=19): "**TWO COPS near the doors come
24   running out in front of Wilee."
25
26
27
28

55

1    **HEALY SCREENPLAY (Seq=16):** "[Levy] looks back at the road, he

2    realizes there's an UNMARKED POLICE CAR blocking his way."

3    **PREMIUM RUSH-DRAFT (Seq=5):** "Monday's unmarked police car pulls

4    through the gate and CRUNCHES to a halt in front of the main entrance."

5    **PREMIUM RUSH-DRAFT (Seq=20):** "ANOTHER COP coming out of an

6    office door at the end of it . . ."

7

8    **HEALY SCREENPLAY (Seq=17):** "Levy SLAMS the brakes."

9    **PREMIUM RUSH-DRAFT (Seq=21):** "Wilee . . . YANK[S] IT INTO THE

10   AIR AGAIN . . . before SLAMMING to the ground . . ."

11

12   **HEALY SCREENPLAY (Seq=18):** "The policemen OPEN FIRE, but to no

13   avail."

14   **PREMIUM RUSH-DRAFT (Seq=22):** ". . . HALF A DOZEN COPS

15   closing in from all directions."

16

17   **HEALY SCREENPLAY (Seq=19):** "Chet, Ho and Wily are seconds away

18   from being at ground zero of a head-on . . . in a maneuver worthy of the *X*

19   Games, she and Chet ROLL UP THE SIDE OF THE TUNNEL."

20   **PREMIUM RUSH-DRAFT (Seq=23):** "- - the door will be closed in a

21   second now, the Cops are just behind him - - - -and he rides off the roof of

22   the van - - "

23   **Disagreement With Love Interests Over Riskiness Of Protagonists' Jobs.  (Healy**

24   **Screenplay p.14, Premium Rush-Draft (2/12/10) p.12).**

25          143.    Both the Healy Screenplay and an early draft of the PREMIUM RUSH

26   screenplay contain a scene in which the protagonists quarrel with their love interests over

27   the risks that the protagonists face as couriers.  In both screenplays, the love interests

28   express disapproval for the risks the protagonists take, and concern for the protagonists'

safety.  The protagonists both state that they prefer their lifestyles, and the love interests respond dismissively.

144.    **The sequences and conversation in the foregoing scene are essentially identical:**

>       **HEALY SCREENPLAY (Seq=1):**  HO: "Chet, as much as I want to admire
>       you, as your friend I have to tell you that that's the stupidest thing you've
>       ever done."
>       **PREMIUM RUSH-DRAFT (Seq=1):**  VANESSA: "I don't get you, man.
>       You got opportunity and all that brain and you throw it away."

>       **HEALY SCREENPLAY (Seq=2):**  CHET: "It was the most intense thing
>       I've ever done."
>       **PREMIUM RUSH-DRAFT (Seq=2):**  "WILEE: "I like it out there"

>       **HEALY SCREENPLAY (Seq=3):**  HO: "Most guys let their dicks run their
>       lives.  Why is it you let your balls run yours? It's not funny! A guy died there
>       last year."; CHET: "He as a skateboarder. I am a blader."
>       **PREMIUM RUSH-DRAFT (Seq=3):** VANESSA: "You could have any job
>       you want"; WILEE "When I see a guy my age in a gray business suit it
>       makes my balls crawl up into my abdomen."

>       **HEALY SCREENPLAY (Seq=4):**  HO: "I won't dignify that with a
>       comment."
>       **PREMIUM RUSH-DRAFT (Seq=4):**  VANESSA: "Whatever."

145.    The direct use of material taken from the Healy and/or Hefter Screenplays (or both) in PREMIUM RUSH demonstrates that the PREMIUM RUSH "writers" had the Healy and Hefter Screenplays in-hand when they "wrote" PREMIUM RUSH.  Because

1    plaintiff does not have access to defendants' internal records at this point, the exact means

2    by which defendants gained access to the Healy and Hefter Screenplays are unknown to

3    plaintiff.  As set forth above, it appears defendants obtained the Hefter Screenplay after it

4    was circulated to participants in the Hollywood entertainment industry or from a Warner

5    Bros.-affiliated source.  It is probable that the Healy Screenplay was obtained from Warner

6    Bros. or a person affiliated with Warner Bros (plaintiff has no information that the Healy

7    draft screenplay was available from any other source).

8        146.    PREMIUM RUSH was not created independently of THE ULTIMATE

9    RUSH.

10       147.    Defendants do not intend to give plaintiff any compensation or credit

11   whatsoever for PREMIUM RUSH.

**FIRST CLAIM FOR RELIEF**

**(COPYRIGHT INFRINGEMENT)**

14       148.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 147,

15   above.

16       149.    The Novel is an original work of authorship and copyrightable subject matter

17   under the laws of the United States.  The Novel has been registered and published in

18   conformity with the Copyright Act and all laws governing copyrights.  The Novel contains

19   a copyright notice advising the reader that the story is protected by the copyright laws.  At

20   all relevant times, plaintiff has been and still is the owner of all copyright rights in and to

21   the Novel.  Plaintiff has never assigned, licensed or otherwise transferred his copyright

22   rights to any of the defendants, or dedicated them to the public.

23       150.    In creating and performing the PREMIUM RUSH screenplays and Film,

24   defendants, and each of them, copied, used, modified, reproduced, distributed and otherwise

25   exploited original and protectable elements and expressions of the Novel, including, but not

26   limited to, the expression of concepts, ideas, plot, theme, dialogue, mood, setting, pace,

27   characters and music both contained therein and incorporated into derivative works.  In all

28   matters alleged in this Complaint, defendants, and each of them, acted without authorization

58

1   of any kind from plaintiff.  Defendants' actions constituted and continue to constitute

2   copyright infringement in violation of plaintiff's exclusive rights under the Copyright Act

3   (17 U.S.C. §§ 101 et seq.).

4       151.   Defendants' infringement has been willful, intentional and in disregard of and

5   with indifference to plaintiff's rights in the Novel.

6       152.   As a result of the defendants' infringement of plaintiff's exclusive copyright

7   rights, plaintiff is entitled to relief under 17 U.S.C. § 504, and to his attorneys' fees and

8   other costs under 17 U.S.C. § 505.

9       153.   Koepp's complete domination of the affairs of DGK and his use of DGK

10  merely as a shell for his own personal benefit makes adherence to the corporate fiction of

11  DGK unjust.  As the alter ego of DGK, Koepp should be personally liable for DGK's

12  conduct and on his contracts, DGK should be liable for Koepp's conduct and on his

13  contracts, and any judgment entered in this case should be entered jointly and severally

14  against Koepp and DGK.

15      154.   Plaintiff has suffered, and will continue to suffer, irreparable injury as a

16  proximate result of defendants' infringing conduct, some substantial portion of which

17  cannot be compensated in money damages if such wrongful conduct is permitted to

18  continue.

19                     **SECOND CLAIM FOR RELIEF**

20        **(CONTRIBUTORY COPYRIGHT INFRINGEMENT)**

21      155.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 154,

22  above.

23      156.   The Novel is an original work of authorship and copyrightable subject matter

24  under the laws of the United States.  The Novel has been registered and published in

25  conformity with the Copyright Act and all laws governing copyrights.  The Novel contains

26  a copyright notice advising the reader that the story is protected by the copyright laws.  At

27  all relevant times, plaintiff has been and still is the owner of all copyright rights in and to

28

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

the Novel.  Plaintiff has never assigned, licensed or otherwise transferred his copyright rights to any of the defendants, or dedicated them to the public.

157.    In creating and performing the PREMIUM RUSH screenplays and Film, defendants, and each of them, copied, used, modified, reproduced, distributed and otherwise exploited original and protectable elements and expressions of the Novel, including, but not limited to, the expression of concepts, ideas, plot, theme, dialogue, mood, setting, pace, characters and music both contained therein and incorporated into derivative works.  In all matters alleged in this Complaint, defendants, and each of them, acted without authorization of any kind from plaintiff.  Defendants' actions constituted and continue to constitute copyright infringement in violation of plaintiff's exclusive rights under the Copyright Act (17 U.S.C. §§ 101 et seq.).

158.    Defendants, and each of them, are liable for contributory copyright infringement for the infringing acts of the other defendants.  Defendants, and each of them, encouraged, induced or materially contributed to the direct infringement of plaintiff's copyrighted work by, inter alia:

(a) Providing funding for the creation of the PREMIUM RUSH screenplays and Film;

(b) Writing and modifying the PREMIUM RUSH screenplays;

(c) Financing the production of the Film;

(d) Producing, filming, editing, marketing and distributing the Film, all of which further involved the creation of additional infringing works and products.

159.    Defendants, and each of them, acted with actual and constructive knowledge of plaintiff's rights and interests in the Novel.

160.    Defendants' infringement is and was willful, intentional and in disregard of and with indifference to plaintiff's rights in the Novel, based upon the direct infringement of the other defendants.

161.    Each and every defendant is jointly and severally liable for contributory copyright infringement.

162.    As a result of the defendants' contributory infringement of plaintiff's exclusive copyright rights, plaintiff is entitled to relief under 17 U.S.C. § 504, and to his attorneys' fees and other costs under 17 U.S.C. § 505.

163.    Koepp's complete domination of the affairs of DGK and his use of DGK merely as a shell for his own personal benefit makes adherence to the corporate fiction of DGK unjust.  As the alter ego of DGK, Koepp should be personally liable for DGK's conduct and on his contracts, DGK should be liable for Koepp's conduct and on his contracts, and any judgment entered in this case should be entered jointly and severally against Koepp and DGK.

164.    Plaintiff has suffered, and will continue to suffer, irreparable injury as a proximate result of defendants' infringing conduct, some substantial portion of which cannot be compensated in money damages if such wrongful conduct is permitted to continue.

### THIRD CLAIM FOR RELIEF

### (VICARIOUS COPYRIGHT INFRINGEMENT)

165.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 164, above.

166.    The Novel is an original work of authorship and copyrightable subject matter under the laws of the United States.  The Novel has been registered and published in conformity with the Copyright Act and all laws governing copyrights.  The Novel contains a copyright notice advising the reader that the story is protected by the copyright laws.  At all relevant times, plaintiff has been and still is the owner of all copyright rights in and to the Novel.  Plaintiff has never assigned, licensed or otherwise transferred his copyright rights to any of the defendants, or dedicated them to the public.

167.    In creating and performing the PREMIUM RUSH screenplays and Film, defendants, and each of them, copied, used, modified, reproduced, distributed and otherwise

exploited original and protectable elements and expressions of the Novel, including, but not limited to, the expression of concepts, ideas, plot, theme, dialogue, mood, setting, pace, characters and music both contained therein and incorporated into derivative works.  In all matters alleged in this Complaint, defendants, and each of them, acted without authorization of any kind from plaintiff.  Defendants' actions constituted and continue to constitute copyright infringement in violation of plaintiff's exclusive rights under the Copyright Act (17 U.S.C. §§ 101 <u>et seq.</u>).

168.    Defendants, and each of them, are liable for vicarious copyright infringement for the infringing acts of the other defendants.  Individually, and in concert with the other defendants, defendants, and each of them, wrote, financed, filmed, developed, produced, marketed, distributed and/or edited the PREMIUM RUSH screenplays and Film.  At all relevant times, the defendants, and each of them, had the right, authority and ability to control or supervise the other defendants' infringing actions and are liable therefor.

169.    Defendants, and each of them, have obtained, and will continue to obtain, a direct financial interest and/or financial advantage as a result of the infringing activities.  The creation of the PREMIUM RUSH screenplays and the creation and forthcoming distribution of the Film, which are both derived from plaintiff's original work, has attracted and will continue to attract a substantial audience.  Defendants, and each of them, have derived, and will continue to derive, substantial exhibition, product, license, advertising and other revenue tied directly to the creation, distribution and other forms of exploitation of the PREMIUM RUSH screenplays and Film.

170.    Defendants, and each of them, acted with actual and constructive knowledge of plaintiff's rights and interests in the Novel.

171.    Defendants' infringement has been willful, intentional and in disregard of and with indifference to the plaintiff's rights in the Novel.

172.    Each defendant is jointly and severally liable for vicarious copyright infringement.

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

1    173.    As a result of the defendants' vicarious infringement of plaintiff's exclusive

2    copyright rights, plaintiff is entitled to relief under 17 U.S.C. § 504, and to his attorneys'

3    fees and other costs under 17 U.S.C. § 505.

4    174.    Koepp's complete domination of the affairs of DGK and his use of DGK

5    merely as a shell for his own personal benefit makes adherence to the corporate fiction of

6    DGK unjust.  As the alter ego of DGK, Koepp should be personally liable for DGK's

7    conduct and on his contracts, DGK should be liable for Koepp's conduct and on his

8    contracts, and any judgment entered in this case should be entered jointly and severally

9    against Koepp and DGK.

10   175.    Plaintiff has suffered, and will continue to suffer, irreparable injury as a

11   proximate result of defendants' infringing conduct, some substantial portion of which

12   cannot be compensated in money damages if such wrongful conduct is permitted to

13   continue.

14   **FOURTH CLAIM FOR RELIEF**

15   **(BREACH OF IMPLIED CONTRACT)**

16   176.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 175,

17   above.

18   177.    Neither THE ULTIMATE RUSH Novel nor the Healy or Hefter Screenplays

19   could be used without compensation to plaintiff.  It is expected, understood and customary

20   in the entertainment industry that when an original creative work is circulated for

21   consideration by the industry, a recipient who desires to make use of it must reach a

22   compensation agreement with the creator.  This expectation of compensation is shared by

23   both the submitting and receiving parties.  Absent an express agreement, the use of

24   submitted material creates an implied contract under which the party who uses the material

25   is required to compensate the creator.

26   178.    Plaintiff, through his agent, directly submitted THE ULTIMATE RUSH to

27   defendants for sale and commercialization.  Defendants also had access to submissions of

28   THE ULTIMATE RUSH through projects that defendants worked on with other Hollywood

1  industry participants to whom THE ULTIMATE RUSH was submitted for sale and

2  commercialization.

3      179.   The Hefter Screenplay was also circulated solely through industry channels

4  with the expectation that if it were used in furtherance of a commercial film project,

5  compensation would be paid for such use.  While it is unclear without discovery exactly

6  how the defendants obtained a copy of the Hefter Screenplay, its limited circulation

7  confirms that the defendants could have obtained a copy only from Hollywood

8  entertainment industry participants.  To plaintiff's knowledge, the Healy Screenplay was

9  available only from Warner Bros. or a person who was affiliated with Warner Bros. or its

10  development of the screenplay.

11      180.   THE ULTIMATE RUSH and the authorized screenplay of THE ULTIMATE

12  RUSH by Jason Hefter were circulated throughout Hollywood (and found their way to the

13  defendants through direct submission or contact by the defendants with parties to whom a

14  submission was made) with the expectation, understanding and customary practice of all

15  parties that any producer, director, writer or other industry participant who wished to use or

16  exploit the works would be required to make a deal that provided both compensation and

17  credit to Quirk.  The defendants likely obtained a copy of the Healy Screenplay from

18  Warner Bros. or an affiliated individual, due to its restricted availability.

19      181.   The proprietary and commercial nature of a pre-release copy of the Novel or

20  synopsis, submitted by a CAA agent, is reasonably understood by any recipient of such a

21  submission within the Hollywood entertainment industry.  On its cover page, the Hefter

22  Screenplay states "No portion of this script may be performed, reproduced, or used by any

23  means, or quoted or published in any medium without the prior written consent of Warner

24  Bros."  The Hefter Screenplay states that it is a screenplay of "THE ULTIMATE RUSH"

25  and was "based on the novel by Joe Quirk."  Likewise, the Healy Screenplay states on its

26  cover that it is a screenplay of "THE ULTIMATE RUSH" and was "based on the novel by

27  Joe Quirk", ownership by"Warner Bros./Material" is stated in the lower right corner and the

28  screenplay possessed by Warner Bros., with whom plaintiff had an express compensation

1  agreement).   Under plaintiff's agreement with Warner Bros., Warner Bros. could not have

2  granted "prior written consent" at any time after its option with plaintiff expired without

3  making a deal with plaintiff.  Anyone who looked at and/or reviewed the Healy or Hefter

4  Screenplay was on notice that it could not be used or exploited in any way without first

5  reaching a compensation deal with another party or parties, including Quirk.

6      182.    When defendants used the Novel and the Healy and/or the Hefter Screenplays

7  without a compensation deal in place, defendants breached, inter alia, the implied contract

8  between Quirk and defendants.

9      183.    Koepp's complete domination of the affairs of DGK and his use of DGK

10  merely as a shell for his own personal benefit makes adherence to the corporate fiction of

11  DGK unjust.  As the alter ego of DGK, Koepp should be personally liable for DGK's

12  conduct and on his contracts, DGK should be liable for Koepp's conduct and on his

13  contracts, and any judgment entered in this case should be entered jointly and severally

14  against Koepp and DGK.

15      184.    Each defendant is jointly and severally liable for breach of implied contract

16  in an amount to be determined at trial.

17                              **FIFTH CLAIM FOR RELIEF**

18                              **(DECLARATORY RELIEF)**

19      185.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 184,

20  above.

21      186.    An actual controversy has arisen and now exists between plaintiff, on the one

22  hand, and defendants on the other hand, in that plaintiff contends, and defendants deny, that

23  defendants have infringed upon plaintiff's copyright in the Novel, THE ULTIMATE

24  RUSH.

25      187.    An actual controversy has arisen and now exists between plaintiff, on the one

26  hand, and defendants on the other hand, in that plaintiff contends, and defendants deny, that

27  defendants are required to account to plaintiff for all profits that result from the exploitation

28

1    of THE ULTIMATE RUSH or, at plaintiff's election, for statutory damages as set forth in

2    17 U.S.C. § 504(c).

3          188.    Plaintiff requires a judicial determination of these issues.

4          189.    Such a declaration is necessary and appropriate at this time so that plaintiff

5    may ascertain his right to compensation and credit for his contribution to the Film and

6    PREMIUM RUSH screenplays, and otherwise to exercise in full his rights protected by

7    copyright law.

8                       **PRAYER FOR RELIEF**

9          WHEREFORE, plaintiff demands judgment against the defendants as

10    follows:

11        1.    As to the First Claim for Relief for Copyright Infringement against the

12    defendants, plaintiff is entitled to:

13            (a)    Judgment against the defendants, jointly and severally, for actual

14                  damages and profits under 17 U.S.C. § 504(b), or the maximum

15                  statutory damages in the amount of $150,000 per willful infringement

16                  and/or $30,000 per infringement under 17 U.S.C. § 504(c), or such

17                  other amount as may be proper under 17 U.S.C. § 504(c);

18            (b)    Preliminary and permanent injunctive relief prohibiting any

19                  unauthorized copying or other use or exploitation of the Novel,

20                  PREMIUM RUSH screenplays or Film, by defendants or anyone

21                  acting in concert with them or under purported rights from them, in

22                  violation of plaintiff's copyright rights;

23            (c)    Prejudgment and post-judgment interest to the extent allowed by law;

24            (d)    Reasonable attorneys' fees and other costs under 17 U.S.C. § 505; and

25            (e)    Such other and further relief as this Court deems just and appropriate.

26        2.    As to the Second Claim for Relief for Contributory Copyright Infringement

27    against the defendants, plaintiff is entitled to:

28

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

1           (a)     Judgment against the defendants, jointly and severally, for actual

2                  damages and profits under 17 U.S.C. § 504(b), or the maximum

3                  statutory damages in the amount of $150,000 per willful infringement

4                  and/or $30,000 per infringement under 17 U.S.C. § 504(c), or such

5                  other amount as may be proper under 17 U.S.C. § 504(c);

6           (b)     Preliminary and permanent injunctive relief prohibiting any

7                  unauthorized copying or other use or exploitation of the Novel,

8                  PREMIUM RUSH screenplays or Film, by defendants or anyone

9                  acting in concert with them or under purported rights from them, in

10                 violation of plaintiff's copyright rights;

11         (c)     Prejudgment and post-judgment interest to the extent allowed by law;

12         (d)     Reasonable attorneys' fees and other costs under 17 U.S.C. § 505; and

13         (e)     Such other and further relief as this Court deems just and appropriate.

14       3.     As to the Third Claim for Relief for Vicarious Copyright Infringement

15  against the defendants, plaintiff is entitled to:

16         (a)     Judgment against the defendants, jointly and severally, for actual

17                 damages and profits under 17 U.S.C. § 504(b), or the maximum

18                 statutory damages in the amount of $150,000 per willful infringement

19                 and/or $30,000 per infringement under 17 U.S.C. § 504(c), or such

20                 other amount as may be proper under 17 U.S.C. § 504(c);

21         (b)     Preliminary and permanent injunctive relief prohibiting any

22                 unauthorized copying or other use or exploitation of the Novel,

23                 PREMIUM RUSH screenplays or Film, by defendants or anyone

24                 acting in concert with them or under purported rights from them, in

25                 violation of plaintiff's copyright rights;

26         (c)     Prejudgment and post-judgment interest to the extent allowed by law;

27         (d)     Reasonable attorneys' fees and other costs under 17 U.S.C. § 505; and

28         (e)     Such other and further relief as this Court deems just and appropriate.

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS

4.      As to the Fourth Claim for Relief for Breach of Implied Contract against the defendants, plaintiff is entitled to:

      (a)      Compensatory damages according to proof;

      (b)      Prejudgment and post-judgment interest to the extent allowed by law;

      (c)      Reasonable attorneys' fees and other costs; and

      (d)      Such other and further relief as this Court deems just and appropriate.

5.      As to the Fifth Claim for Relief for Declaratory Relief against the defendants, plaintiff is entitled to:

      (a)      A declaration that the defendants infringed on plaintiff's copyrighted Novel, THE ULTIMATE RUSH through the creation, production, promotion, display and other exploitation of the Novel, screenplays and Film, PREMIUM RUSH;

      (b)      A declaration that the defendants are required to account to plaintiff for all profits that result from the exploitation of THE ULTIMATE RUSH, and

      (c)      A declaration that plaintiff can elect statutory damages as set forth in 17 U.S.C. § 504(c); and

      (d)      Such other and further relief as this Court deems just and appropriate.

DATED: November 28, 2012.          VALLE MAKOFF LLP

By:  */s/ Jeffrey T. Makoff*
        Jeffrey T. Makoff
        Attorneys for Plaintiff
        Joe Quirk

1

## <u>DEMAND FOR JURY TRIAL</u>

2      Plaintiff hereby demands a jury trial on all issues triable by jury as provided by Rule

3   38(b) of the Federal Rules of Civil Procedure.

4

5

6   DATED:  November 28, 2012              VALLE MAKOFF LLP

7

8                                         By: */s/ Jeffrey T. Makoff*

9                                             Jeffrey T. Makoff
                                              Attorneys for Plaintiff
10                                            Joe Quirk

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIFTH AMENDED COMPLAINT; CASE NO. C 11-03773 RS