IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JOE QUIRK,

        Plaintiff,

   v.

SONY PICTURES ENTERTAINMENT INC., et al.,

        Defendants.

No. C 11-3773 RS

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

In 1998, plaintiff Joe Quirk published a novel entitled *Ultimate Rush*, about a San Francisco package delivery service messenger, who carried out athletic and daring feats on rollerblades, and became involved in perilous situations with criminals relating to the contents of packages he was delivering. Quirk considered the action novel well-suited for adaption into a movie, and secured an option contract from Warner Brothers to that end. Although Warner Brothers commissioned two separate screenplays to be written from the book, it ultimately never pursued the project, and its option lapsed.

In 2010, Quirk heard from his publisher, friends and acquaintances that a movie entitled *Premium Rush* was in production. Set in New York, *Premium Rush* tells the story of a bicycle messenger pursued by a rogue cop, who is trying to obtain the mysterious contents of a package the

messenger has been hired to deliver. Quirk concluded that *Premium Rush* represented an unauthorized adaptation of his novel, and brought this action for copyright infringement against the screenwriter and director, and various entities involved in the production of the movie. Quirk also asserted a so-called *Desny* claim,[1] contending that defendants had breached an implied contract to pay for use of his work, regardless of whether their movie includes material that infringes his rights under copyright law.

In two separate motions, defendants now seek summary judgment on the copyright and *Desny* claims. In Quirk's view, there are sufficient similarities between his novel and the movie, particularly if traced through the intervening screenplays, to give rise to a strong inference that defendants had his novel and/or the screenplays commissioned by Warner Brothers in hand when writing and making their movie. Quirk proceeds, however, from an incorrect underlying legal premise. He believes that if he can show that defendants "adapted" his book into the movie, liability in copyright and/or under *Desny* will follow, *a fortiori*. Copyright, however, protects expression, not ideas, and even assuming defendants used Quirk's novel as a starting point, and "copied" from it as they worked, the final film does not include substantial similarities to any copyrightable expressions of the novel. "Copying deleted or so disguised as to be unrecognizable is not copying." *See v. Durang*, 711 F.2d 141 (9th Cir. 1983). While a *Desny* claim does allow protection for ideas in narrow circumstances, even assuming defendants had a copy of Quirk's novel in hand, liability does not follow for a number of reasons explained below. Accordingly, defendants' motions will both be granted.

## II. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*,

---

[1] *Desny v. Wilder*, 46 Cal.2d 715 (1956).

477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id.* at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) (*citing Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

### III. BACKGROUND

Quirk wrote "The *Ultimate Rush*" between 1994 and 1997. He describes it as an "action-driven" novel, always intended for possible adaptation into a movie, "due to its highly-cinematic features." The novel was published in March of 1998 and released in paperback in October of 1998. Although the sales of the novel were modest, by Quirk's own admission, it was extensively reviewed and commented on in the media, and was widely available commercially.

Prior to publication, Quirk retained an agent, Matthew Snyder of California Artists Agency ("CAA"), who distributed pre-release copies and synopses of the novel to various persons and entities throughout the movie industry, seeking a film development deal. Eventually, Warner Brothers bought an option. During the term of that option, Warner Brothers commissioned two separate writers to prepare screenplays from the novel. The project never went forward, however, and the option eventually expired. Warner Brothers is the copyright holder in the two scripts it commissioned, and is not a party to this action.

The movie *Premium Rush* was written and directed by defendant David Koepps, and co-written by former defendant John Kamps. Koepps and Kamps allegedly both have "specialized" in adapting the works of other writers into feature films. Separately and jointly they have written screenplays for many well-known films that were adaptations of other works. *Premium Rush* was released in 2012, after this litigation was underway.

### IV. DISCUSSION

#### A. Copyright claims

The operative Fifth Amended Complaint [2] asserts four claims for relief sounding in copyright—direct infringement, contributory infringement, vicarious infringement, and declaratory

---

[2] At the time the motion for summary judgment on the copyright claims was filed, the operative pleading was the Fourth Amended Complaint. The Fifth Amended Complaint only added an additional defendant and did not otherwise change the allegations. Pursuant to the parties' stipulation, the motion is deemed applicable to the Fifth Amended Complaint and the new party is bound by this ruling.

relief. The sole basis of defendants' challenge to all four counts is their contention that, "[p]laintiff has failed to adduce sufficient evidence of substantial similarity of copyright-protected material between his novel and Defendants' motion picture."

The analysis here is guided by the Ninth Circuit's opinion in *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072 (9th Cir. 2006), in which the court upheld a summary judgment ruling that the HBO series "Six Feet Under" bore no "substantial similarity" to the plaintiff's screenplay for a proposed series called "The Funk Parlor," which had previously been provided to an HBO executive. As explained in *Funky Films*, a plaintiff bringing a claim for copyright infringement must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, (1991). Here, as Quirk's ownership in the copyright of his novel is undisputed, he need only demonstrate a triable issue of fact whether the defendants "cop[ied] anything that was 'original' to" the work. *Id.*

Except in cases with direct evidence of copying, "proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000). For purposes of this motion, defendants have not challenged that they had access to Quirk's novel, so the only question presented is whether the two works are substantially similar.

"When the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994) (internal citations and punctuation omitted). While "summary judgment is not highly favored on the substantial similarity issue in copyright cases," *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985), the question "may often be decided as a matter of law." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). Indeed, the Ninth Circuit has "frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990). See *Berkic*, 761 F.2d at 1292 ("we have frequently affirmed summary judgments in favor of copyright defendants on the substantial similarity issue")

(citing cases); *see also Kouf*, 16 F.3d at 1045-1046 (finding no substantial similarity as a matter of law). Thus, while Quirk quite reasonably stresses that summary judgment on substantial similarity is to be approached with caution, it plainly is available in appropriate circumstances.

The substantial-similarity test contains an extrinsic and intrinsic component. At summary judgment, courts apply only the extrinsic test; the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury. *See Shaw*, 919 F.2d at 1360-61. A "plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045.

The extrinsic test is objective and "it depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Krofft*, 562 F.2d at 1164. The focus is on the presence or absence of "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. *Kouf*, 16 F.3d at 1045 (citations omitted). In applying the extrinsic test, the court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic*, 761 F.2d at 1293.

"[P]rotectable expression includes the specific details of an author's rendering of ideas." *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002). Scenes à faire, however, which flow naturally from generic plot-lines, are not protectable. *See id.* The court "must take care to inquire only whether the protectable elements, standing alone, are substantially similar." *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (citations omitted). In particular, the court must "filter out and disregard the non-protectable elements in making [the] substantial similarity determination." *Id.*

### 1. The adaptation process

The central premise of Quirk's oppositions to these motions is that a comparison between his novel and defendants' movie reveals the latter to be an "adaptation" of the former. Quirk offers the expert declaration of Bruce Gelfand to explain the nature and extent of changes that screenwriters

often make when adapting an underlying novel into a movie, and to provide an opinion that *Premium Rush* bears the hallmarks of having been created from *Ultimate Rush* through an entirely typical process of adaptation. The fundamental flaw in Quirk's analysis is that he effectively assumes he has a viable claim in copyright and/or under *Desny* as long as he can prove the movie is an "adaption" of the novel in the sense described by Gelfand.

Gelfand defines adaptation as "a process of dramatic refinement of an underlying original work, to create an effective new work *utilizing the strengths of the original work*." (Emphasis added). While Gelfand acknowledges that adaptation is itself a craft requiring skill and creativity, he repeatedly suggests that one advantage to creating movie scripts through adaptation rather than as wholly original works of authorship is to save time, money, and effort. Gelfand suggests that even where elements of a movie are radically different from an underlying novel, and perhaps are even improved, the adaptors still "stand on the shoulders" of the original author.

However accurate Gelfand's description may be as to how movie scripts often are adapted from underlying novels, it does not reflect the appropriate legal standard for determining when a movie is a copy of (or, more precisely, a derivative work made from) an underlying novel within the meaning of copyright law. As he correctly notes at one point, "a piece of written work might have started as a copy of another work, but been changed so much that it can no longer be said to be substantially similar." Although Gelfand offers that concession only in the context of disputing defendants' claim that *Premium Rush* was "independently created," it demonstrates that in his analysis, a movie could be an "adaptation" of a novel while not retaining substantial similarities that would give rise to copyright liability. The law, however, is clear: "Copying deleted or so disguised as to be unrecognizable is not copying." *See v. Durang*, 711 F.2d 141 (9th Cir. 1983). The law is also clear that "ideas contained in a copyrighted work may be freely used so long as the copyrighted expression is not wholly appropriated." *Allen v. Academic Games League of America, Inc.* 89 F.3d 614, 617 (9th Cir. 1996).

By defining "adaptation" so broadly as to include a new work that merely utilizes "strengths" of the underlying work (rather than elements of protectable *expression*), and by considering new works with no substantial similarity to underlying novels as being within the

meaning of "adaptation," Gelfand has offered an analysis that addresses the wrong factual question. If Gelfand's comparisons between the works are fair, and the conclusions he draws logically sound, then perhaps a reasonable inference could be drawn that the script of *Premium Rush* was developed through an "adaptation" process that began with Quirk's novel (and/or one or both of the Warner scripts) as a starting point. The process by which *Premium Rush* was written is, though, tangentially relevant, at best. It would, for instance, bear on *willfulness*. The threshold question, however, and one which Gelfand's mode of analysis is ill-designed to address, is whether the end product of the *Premium Rush* movie is "substantially similar" to Quirk's novel, as that term is used in copyright law.

While Gelfand correctly states, "the goal of the analysis is to determine whether there are substantial similarities in the works," he goes on to assert that "in the context of a novel-to-film adaptation, the issue here is what kinds of similarities between a novel and a film would tend to show that the screenplay film was copied (including unpermitted adaptation)." Thus, Gelfand has abandoned the correct inquiry (is there substantial similarity?) in favor of attempting to show that defendants *used* Quirk's novel and/or the Warner screenplays as inspiration and as a shortcut around what would have been required by truly independent creation. Even assuming Gelfand is factually correct that *Premium Rush* was "adapted" from Quirk's novel in exactly the manner he believes occurred, and even assuming that the features he identifies as similarities are evidence of such an adaptation process, it simply does not automatically follow that there is liability under copyright law (or even under *Desny*, for reasons discussed below).[3]

---

[3] Gelfand offers examples of movies expressly presented as adaptations of underlying books, where the film differed greatly from the original work, but the original author still received credit and compensation. Such examples merely beg the question, however, as to whether one of those authors would have been entitled to compensation had there been no contract in place and the final film lacked substantial similarity of copyrightable expression. That filmmakers sometimes *do* acknowledge and compensate authors even where their films ultimately would not otherwise constitute infringing work does not create legal liability where a filmmaker uses only non-protectable ideas without attribution or compensation.

### 2. Intermediate scripts

Quirk's original opposition, and Gelfand's analysis, both rely heavily on drawing comparisons between either or both of the two Warner Brothers scripts and *Premium Rush*, or, in many instances between those scripts and *early drafts* of the *Premium Rush* script. Such comparisons naturally further Quirk's interest in attempting to show that the movie was made through an adaptation process that began with the novel, and progressed through multiple scripts to a final product. Neither the Warner Brothers scripts nor any preliminary drafts of the *Premium Rush* script, however, are relevant to the issues presented by this motion.

As noted in a prior order and not disputed by Quirk here, he lacks standing to pursue a copyright claim based on alleged infringement of any expression found in either of the Warner Brothers scripts that is not present in his novel. While Quirk does have standing to pursue copyright claims with respect to any protectable elements of expression in the Warner Brothers scripts *also* appearing in his novel, there is no reason for him to point to the scripts rather than directly to the novel.

Preliminary draft scripts of *Premium Rush* are similarly irrelevant to this motion. Quirk has not pleaded a claim that draft scripts constituted infringing works, even assuming such a claim might theoretically be possible. To argue the drafts are relevant, Quirk relies on *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992) for the proposition that copyright law "does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent." In so doing, he overlooks the fact that in *Sega* the legality of "intermediate copying" of computer code was directly at issue. The court expressly distinguished cases, like this one, involving alleged copying of books, scripts, or literary characters, where "the eventual lawsuit alleged infringement only as to the final work of the defendants." Quirk also points to *Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986), but as his own quotation from that case shows, preliminary drafts were potentially relevant only "to show that defendants had gained access to plaintiff's work, borrowed from it, and later made changes in order to conceal that borrowing." *Id.* at 52. Access is *not* at issue here, as discussed above.

Additionally, even if defendants in this instance "borrowed and then made changes to conceal that borrowing," there is no liability in copyright unless they failed to make enough changes to conceal the borrowing. Once again, "[c]opying deleted or so disguised as to be unrecognizable is not copying." See v. Durang, 711 F.2d 141 (9th Cir. 1983). In Durang, summary judgment had been granted for defendants based on lack of substantial similarity. On appeal, the plaintiff argued he should have been allowed further discovery to obtain "early drafts of defendant's play on the theory they might reflect copying from plaintiff's play that was disguised or deleted in later drafts." Id. at 142. The Ninth Circuit rejected that argument (and others) and affirmed. Id. Thus, even assuming the preliminary drafts of *Premium Rush* scripts would be admissible to show access, and that they include indications of copying that was later deleted or revised, the only relevant question at this juncture is whether the final movie as filmed, edited, and released contains matter substantially similar to protectable elements of Quirk's novel.[4]

### 3. Inverse ratio

Quirk contends that because defendants have not challenged access for purposes of this motion, he is entitled to the benefit of the so-called "inverse ratio rule." See *Swirsky v. Carey*, 376 F.3d 841, 844-45 (9th Cir. 2004) (holding that the degree of similarity that a plaintiff must establish is reduced when there is evidence that a defendant had extensive access to the plaintiff's work). On reply, defendants argue that the inverse ratio rule should *not* be applied because Quirk has the burden to show access, and mere allegations in his complaint are not sufficient to raise a triable issue of fact on that point. Defendants fail to recognize that because they expressly disclaimed any challenge to that element of the claim, the burden never shifted to Quirk to come forward with evidence in support of his allegations. See *Celotex*, 477 U.S. at 323 (moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it

---

[4] In light of these conclusions, Quirk was given the opportunity to submit an analysis that was limited to comparing the final movie as made to his book. Without waiving his arguments that the intermediate scripts are relevant, Quirk did so.

believes demonstrate the absence of a genuine issue of material fact.") Defendants' moving papers plainly state that they "are not moving for summary judgment on the issue of access at this time." Accordingly, Quirk has the better argument that the inverse ratio rule can and should be applied to his benefit for purposes of this motion, and that he need only show a somewhat lesser degree of similarity to prevail.[5] As discussed below, however, even under a lower standard, there is an insufficient showing of substantial similarity.

### 4. Substantial similarity

Quirk's novel tells the story of Chet, a rollerblading messenger in San Francisco who is wrongly suspected of murdering a fellow messenger and who is being pursued by members of a criminal enterprise. The murder took place after Chet and his fellow messenger had become involved in delivering packages as part of a sprawling insider trading conspiracy involving investment bankers, Chinese drug lords, Italian mafia, a corrupt police officer, and a courier dispatcher. The dispatcher was central to the scheme, and selected Chet to make the deliveries that led to his involvement in the peril.

The novel includes elements such as Chet's use of computer hacking skills to uncover and expose the conspiracy, his psychological issues resulting from the traumatic death of his parents and his brother's drug addiction, his friendship with a disabled computer hacker roommate, and his romance with a bisexual punk musician skateboarder. The story unfolds over the course of many days in a linear narrative told from Chet's point of view. The book takes advantage of the unique settings of San Francisco, including scenes involving the city's hills, specific areas, cable cars, and the BART system. Quirk himself characterizes a dominant theme in the book as "the friction between the privileged and unempowered" which "is played out physically in the streets, [and] the unempowered win."

*Premium Rush* presents one afternoon in the life of Wilee, a New York bicycle messenger, who is attempting to deliver a package that, unknown to him for much of the story, contains a "Hawala ticket." The ticket can be exchanged for cash, and is used among some in the Chinese

---

[5] More precisely, Quirk only need show a triable issue of fact as to the existence of a somewhat lesser degree of similarity.

community to transfer money that cannot be easily traced. A corrupt police officer learns about the ticket, and the delivery in progress, from Chinese gaming operators to whom he owes a large gambling debt. The officer determines to steal the ticket, and begins chasing Wilee through the streets of New York.

The two works differ greatly in many large and small details as well as in their overall mood, style, and structure. In his supplemental comparison that focuses solely on the book and the final movie product, Quirk has nonetheless managed to set out some 35 pages of alleged substantial similarities. Review of that listing, however, reveals that Quirk is relying on subjective and often highly unfair *characterizations* of material in the book and the movie to create highly strained purported "similarities."

Examples include Quirk's insistence that the dispatcher characters in the two works are highly similar, while pointing only to generalized traits and negative behaviors. Moreover, despite purporting to limit his comparison to the book and the final movie, Quirk's supplemental filing resorts to arguing that in earlier drafts of the film, the dispatcher had "near-identical personal habits" to the character in the book. Quirk contends that by the final film, the dispatcher "had become a more funny/less abrasive South Asian-American jerk, so that a well-known South Asian-American actor/comedian (Aasif Mandvi) could be used in the role." This is an admission that the dispatch character was *changed* from the character created by Quirk, and it again reveals Quirk's underlying premise that he can prevail merely by showing that the movie was adapted from the book. If the movie character evolved from one greatly resembling the book character into one with fewer commonalities, that might indeed support an inference that the book served as a source for the movie. It has no bearing, however, on whether the character in the final film is substantially similar to the character in the book, under principles applicable in copyright law.

Another example arises in Quirk's contention that the presence of "Chinese gangsters" in both works represents a point of substantial similarity. Those elements, however, are far too generalized and generic to support an infringement claim. Quirk's characterizations notwithstanding, the "Chinese gangsters" also play very different roles in the two works. In the book, the gangsters are among the antagonists chasing the messenger hero and threatening his life.

In the movie, the gangsters are antagonistic to the corrupt policeman who is chasing and threatening the messenger—they are not the messenger's enemy, but rather the enemy of his enemy.

Quirks' comparisons also often misstate matters to create an exaggerated sense of the degree of similarity. Quirk describes the opening scenes of his book as including a depiction of Chet, maneuvering "through the city skillfully and brakeless, challenged by changing street lights," and he asserts that the beginning of the movie shows Wilee doing the same. Chet, however, is on rollerblades which are described as in fact *including* heel brakes, which Chet uses, and shows another character how to use. Chet's streetlight challenge at the outset involves him needing to time the start of his descent down a steep hill perfectly to catch all the green lights. His waiting for the precise moment to start is a significant part of the scene. Wilee faces no such challenge; he merely runs one red light. Thus the only real connection is the extremely broad similarity that both works have scenes near the beginning where the hero messenger maneuvers through the city "skillfully."

Finally, in a particularly strained comparison, Quirk equates an incident in his book where the Chinese gangsters kidnap Chet's love interest and hold her hostage, with the fact that the movie depicts Wilee's bicycle being taken to a police impound lot while he is being transported to the hospital after an accident. Quirk asserts that the corrupt policeman "seized" the bike, when in fact it appeared to have been impounded as a matter of routine police procedure, carried out by other members of the police force. In any event, Quirk's description of these two very different events as both being "[a]ntagonists take a hostage as leverage with [Chet/Wilee]" is emblematic of how tortured the attempt to find substantial similarity between the works becomes. A bicycle impounded after an accident, even if done at the direction of a corrupt police officer who has been pursuing the hero, is simply not the same idea, much less the same expression, as the kidnapping of the hero's love interest by Chinese gangsters.

Quirk's remaining points of comparison virtually all suffer from the same or similar flaws. Selective and/or distorted characterizations of any two things can, of course, produce points of similarities. A blue whale is much like a hamster with respect to all the mammalian features they share. Yet a hamster is more like a sparrow than a whale, if one focuses on size, or the likelihood of finding one in the ocean, rather than whether the creatures under comparison are both mammals.

The fact that a hamster bears some important features in common with whales, others with sparrows, and yet others with both, does not necessarily make a hamster "substantially similar" to either a whale or a sparrow.

Upon filtering out all the non-protectable elements and disregarding characterizations not fairly supported by the two works, Quirk simply has not pointed to sufficient commonalities of expression from which a reasonable fact-finder could conclude the movie and the book contain substantially similar protectable expression. Accordingly, summary judgment on the copyright claims is warranted.

B. *Desny claim*

In 1956, the California Supreme Court recognized an implied contractual right to compensation when a writer submits material to a producer with the understanding that the writer will be paid if the producer uses the concept. *Desny*, 46 Cal.2d at 739. The Ninth Circuit has reaffirmed that *Desny* claims remain viable and are not preempted by copyright law. *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 976-977 (9th Cir. 2011). The *Montz* court described the essence of the claim as resting on "an expectation *on both sides* that use of the idea requires compensation." *Id.* at 976. Such a "bilateral understanding of payment" is critical, because it "constitutes an additional element that transforms a claim from one asserting a right exclusively protected by federal copyright law, to a contractual claim that is not preempted by copyright law." *Id.*

The *Desny* court elaborated, "the idea purveyor cannot prevail in an action to recover compensation for an abstract idea unless (a) before or after disclosure he has obtained an express promise to pay, or (b) the circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances, show a promise of the type usually referred to as 'implied' or 'implied-in-fact.'" 46 Cal. 2d at 738. Moreover, "[t]he law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue." *Id.* at 739.

At the pleading stage, Quirk was permitted to proceed with his *Desny* claim because he had alleged, albeit with a fair degree of speculation and uncertainty as to the details, that defendants had obtained his novel and/or one of the Warner Brothers screenplays under circumstances that might support a "bilateral expectation of payment." Quirk had speculated as to a large number of possible means of transmission of his work to defendants. Now, after discovery, Quirk asserts that the evidence supports a compelling inference that defendants somehow obtained the Warner Brothers scripts and a copy of the novel from CAA, which undisputedly retained those materials in its files. Specifically, Quirk insists it is a "virtual certainty" that defendant Koepp, who was also represented by CAA, obtained the *Ultimate Rush* material "through his agents at Creative Artists Agency."[6]

In support, Quirk relies on the absence of evidence to support any *other* method of transmission of either the book or the Warner Brothers scripts, the presence of those materials in the CAA library, CAA's representation of Koepp, and some indications that persons at CAA circulated materials relating to *Ultimate Rush* at a point in time long after Warner Brothers' efforts to develop the project had been abandoned. Quirk's argument also depends heavily on his premise that a comparison of the novel, the movie, and the intervening scripts, reveals clear signs of the "adaption process."

There is a degree of circularity to Quirk's contentions. *If*, as he contends, the indications that *Premium Rush* was adapted from Quirks novel are unmistakable and undeniable across the various intervening scripts, *then* defendants necessarily had copies of at least the Warner Brothers scripts, and possibly the novel itself, when writing and making *Premium Rush*. *If* defendants indeed had those materials in hand, *then* perhaps the only reasonable inference is that they obtained them from CAA. Yet as Quirk's urging for application of the inverse ratio rule reveals, his argument that the works have similarities indicative of "copying" to some degree reflects an assumption that

---

[6] Quirk's agent did pitch *Ultimate Rush* directly to defendant Columbia back in the late 90's. Although Quirk argues that Columbia can be held liable under various theories, he does not contend there is any evidence that Columbia made the movie as a result of anything it learned at that time, or that it had a copy of the book or other materials in its possession when *Premium Rush* was being developed. While Quirk contends the prior contact between Quirk's agent and Columbia is relevant, his *Desny* theory now rests solely on the allegation that defendants obtained possession of the Warner Brothers scripts and the novel through CAA.

15

defendants had access in the first instance. The argument also relies on concluding that there are similarities across the various works that can only be explained if defendants worked with the book and/or the Warner Brothers scripts at the ready, a proposition that remains speculative.

In any event, with the evidentiary record now developed, Quirk's *Desny* claim fails for each of the following independent reasons. First, even assuming a reasonable fact-finder could conclude that commonalities among elements found in the novel, the movie, and the intervening scripts demonstrate that *Premium Rush* was created by a process of adaptation from *Ultimate Rush*, Quirk still lacks evidence that defendants utilized any of his ideas under circumstances giving rise to a "bilateral expectation of payment." Quirk's "virtual certainty" that Koepp obtained materials from "his agents" at CAA is not only sheer speculation, it lacks any detail as to the precise circumstances, rendering it insufficient as a showing of conditions under which an implied contract might arise.

Second, Quirk is relying primarily on the notion that any person obtaining a copy of either of the Warner Brother's scripts allegedly would have known and understood, from warnings on the scripts themselves, that they could not be used absent some contractual arrangement for payment. As noted in the prior order, a *Desny* claim for use of ideas embodied in a novel might be viable even where those ideas were transmitted to the defendants through the medium of an intervening derivative work. Nevertheless, at least part of Quirk's argument is that defendants' movie can be seen as an embodiment of ideas developed in those screenplays but not necessarily present in the same form in book. It is therefore unclear either that expectations relating to the conditions under which the *scripts* could be used are sufficient to support a *Desny* claim arising from the book, or that Quirk has any standing to bring a *Desny* claim arising from any use of the scripts.

Third, and perhaps most fundamentally, regardless of the precise circumstances under which defendants may have obtained and used copies of the Warner Brothers scripts, the novel, or both, any *Desny* claim arising from use of ideas found in the book necessarily fails as a matter of law, given Quirk's voluntary wide public distribution of those ideas years before defendants ever began working on their movie. As the *Desny* decision itself states:

> The idea man who blurts out his idea without having first made his bargain has no
> one but himself to blame for the loss of his bargaining power. The law will not in any

16

event, from demands stated subsequent to the unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure.

46 Cal. 2d at 739.

Here, Quirk's publication of *Ultimate Rush* in the late 1990's was an "unconditioned disclosure" to the public at large of *all* of the ideas contained in the novel. From the outset of this litigation, Quirk has admitted that if defendants worked from a copy of his novel they purchased on the open market, he would have no viable *Desny* claim. There is no reason in law or logic that the result should be different even assuming defendants worked from a copy of the novel (and/or from the Warner scripts) obtained through CAA. Quirk is, in effect, claiming that the legends on the Warner scripts, and the other circumstances that necessarily would surround any transmission of the materials to defendants from CAA, are demands for payment that imply a promise by defendants to pay, upon any use by them of the ideas of the novel. Those "demands," however, were made many years *after* the ideas of the novel were unconditionally disclosed to the public, and therefore *cannot* "imply a promise to pay for the idea, for its use, or for its previous disclosure."

While *Montz* does not purport to set out what must be pleaded or proved at a minimum to support a *Desny* claim, its description of the plaintiffs' allegations before it is instructive. The *Montz* plaintiffs had averred that the "disclosure of their ideas and concepts was strictly confidential" and that defendants impliedly agreed they "would not disclose, divulge or exploit the Plaintiffs' ideas and concepts without compensation and without obtaining the Plaintiffs' consent." 649 F.3d at 978. It may be that a plaintiff can pursue a *Desny* claim even where the subject ideas have not been treated with the utmost degree of secrecy and confidentiality, but *Montz* shows that the touchstone remains whether the plaintiff can be said to be disclosing something that is not otherwise freely available to the defendant. Indeed, it is the *disclosure* of ideas, not protectable under copyright law, but of potential value to the defendants, that serves as the consideration for the implied promise to pay. *See Desny*, 46 Cal. 2d at 733 ("The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract. Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed. That disclosure may therefore be consideration for a promise to pay . . . .").

Quirk elected to disclose the ideas in his novel to the entire world without any conditions, other than those arising from copyright law, on the ability of persons to make whatever use of the ideas in the novel they wished. He cannot now claim defendants were nevertheless impliedly bound to pay for using the ideas, regardless of the precise circumstances under which they were exposed to the novel (if they were) years later. Accordingly, summary judgment must be granted in defendants' favor on the *Desny* claim.

## V. CONCLUSION

Defendants' motions for summary judgment are granted. A separate judgment will issue.

IT IS SO ORDERED.

Dated: 4/2/13

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE